(No. 37406.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HERMAN L. BERNETTE, Plaintiff in Error.

*Opinion filed January 22, 1964.*

House, J., dissenting.

Warren J. Carey, of Chicago, appointed by the court, for plaintiff in error.

William G. Clark, Attorney General, of Springfield, and Daniel P. Ward, State's Attorney, of Chicago, (Fred G. Leach and E. Michael O'Brien, Assistant Attorneys General, and Elmer C. Kissane and James R. Thompson, Assistant State's Attorneys, of counsel,) for the People.

Mr. Justice Daily delivered the opinion of the court:

Defendant, Herman L. Bernette, was indicted in the criminal court of Cook County, jointly with Martin Tajara, Samuel Young and Joe Ray Garrett, and charged with the murder of Richard Williams, who was slain in the course of an armed robbery. The decedent was the assistant manager of a restaurant that was robbed; Tajara and Young were employed at the restaurant as head cook and dishwasher, respectively; Garrett had been employed there as a dishwasher until laid off about six weeks prior to the homicide; while defendant was an acquaintance of Young and Garrett. The latter was granted a severance and after a jury trial jointly with Tajara and Young, defendant was found guilty, the jury fixing his punishment at death. Defendant sued out a writ of error to this court for a review of the judgment of conviction and, while that writ was pending, filed in the criminal court a petition for relief under the Post-Conviction Hearing Act, (Ill. Rev. Stat. 1961, chap. 38, pars. 826-832,) alleging a substantial denial of his constitutional rights due principally to the purported

incompetence of his appointed counsel. After a hearing, this petition was denied and upon leave granted by this court under Rule 27, (Ill. Rev. Stat. 1961, chap. 110, par. 101.27,) defendant has filed a separate writ to review such order of denial. We have consolidated the two writs for consideration and opinion. It also appears that defendant was accorded a sanity hearing after verdict had been returned in the principal case, but no appeal has been taken from the result of such hearing.

### The Conviction of Murder

At about 1:00 A.M. on the morning of November 13, 1961, a restaurant located at 8301 W. North Avenue, in Melrose Park, Cook County, was locked up and closed for business for the day. All patrons and waitresses had since departed, and present to attend to closing and cleaning details were Richard Williams, Samuel Young and a cook named Wallace Peterson. Mrs. Williams came to the premises about 1:30 A.M., being admitted by her husband through a back door which was kept locked. A short time later, Young obtained the key to the back door from Williams so that garbage could be removed. Several cans were then carried out by Young and Peterson, the testimony of the latter being that Young had carried out the last can and that he, Peterson, had returned to work near a walk-in refrigerator as Young was completing the garbage detail. During this time, Williams was in the basement of the building where several storerooms were located.

Within minutes after Young had returned to the inside of the kitchen, a man carrying a pistol in his hand entered through the back door and announced that it was a hold-up. The intruder had a brown paper shopping sack over his head which had eye-holes and a slit for the mouth torn from it, and both Mrs. Williams and Peterson agreed that he wore leather gloves, that skin visible at the eye-holes revealed him to be a colored man, and that he wore a

leather jacket. Peterson said in addition that the gunman was wearing blue trousers and heavy shoes, and that all of his clothing was extremely dirty. After first ordering Mrs. Williams to open the safe and being told she did not work there and did not know how, the masked man inquired if anyone else was there and Young volunteered that Williams was in the basement. At this, Mrs. Williams, Peterson and Young were herded down the basement stairs at gun point. When Williams was encountered, his wife told him it was a hold-up and his reaction was to put his hands up and to say to the gunman: "Okay, I'll do anything you say."

Leaving the other three persons in a basement storeroom, Williams and the robber proceeded upstairs and those in the basement heard the office safe opening and the sound of some change falling on the floor, after which there was a shot and Williams was heard to shout: "Oh God, no." When Mrs. Williams and Peterson came to the office moments later the felon had departed and Williams was found lying on the floor in front of the safe, mortally wounded by a bullet in the chest. Police officers who were summoned found a spent Remington .380 calibre shell four or five feet from the safe, and discovered the paper sack mask in the restaurant parking lot. A subsequent check revealed that about $2,000 was missing from the safe.

Defendant's apprehension and connection with the slaying came about in a unique way. Around 1:00 A.M. on the morning of November 14, 1961, or about twenty-four hours after the homicide, a lady named Annie Borden, who had been working since 3:00 P.M. of the preceding afternoon, returned to her two-room apartment on the second floor of 2951 W. Washington Street in Chicago. When she could not enter because something was obstructing the door from the inside, she summoned the police. As the officers arrived, defendant emerged from the apartment and was taken into custody. He showed the police how he had entered by

climbing through a window, and explained his presence by saying that detectives from Maywood were pursuing him on a "phony charge," that he had become tired and had entered the apartment to get some sleep. Annie Borden had never seen him before. This witness, as well as several police officers, testified that defendant was wearing a brown leather jacket and blue pants, both of which were extremely dirty. One officer found a pair of leather gloves stuffed in defendant's trouser pocket, but no money was discovered on his person. Defendant was detained on a charge of entering the apartment and remained in jail when he could not raise bail.

Six days later, as she was cleaning her apartment, Annie Borden discovered a gun under a large over-stuffed chair about five feet from the bed where defendant had slept. The police were again called and it was found that the gun was a .380 calibre automatic pistol. It was loaded with five .380 calibre Remington bullets, one in the chamber and four in the magazine. Subsequent ballistic tests established that it was the weapon with which Williams had been killed, and at defendant's trial Peterson identified it as the pistol carried by the robber.

The exact manner in which Tajara, Young and Garrett were implicated and apprehended does not appear in the abstract presented but, in any event, all were in custody on November 22, 1961, on which date they joined with defendant in giving a written statement to an assistant State's Attorney. In this statement, admitted into evidence at the trial after an extensive inquiry into its voluntary or involuntary character, defendant related that he had been approached by Tajara and Young about three weeks prior to the homicide with a plan to hold up the restaurant, but had told them he wasn't interested. While the remainder of the statement does little to clearly fix dates and times, it appears that Young and Tajara continued with their efforts to persuade defendant, and that the latter finally

agreed to participate on the day of the crime, at a time when they were drinking at the house of a man to whom the statement refers as Clyde *Grayson*. The matter of a weapon was discussed and it was decided that a gun would be borrowed from Garrett. After this, according to defendant's admissions in the statement, he and Young left the drinking place and went to the house of defendant's sister where they remained until Tajara showed up and gave defendant a gun and a pair of gloves. Defendant said he then returned to Clyde's house, driving his sister's car; that he bought and drank some whiskey there, then departed and "went to the club;" and that the last he remembered of the gun Tajara had given him was leaving it in his sister's car after he had "parked it in back of the garage." So far as we can ascertain, the "club" and the "garage" referred to in the statement are not further identified in the record of the murder hearing.

It further appears from the statement that upon being shown the gun found in the Borden apartment, defendant said he didn't know if it was the gun Tajara had given him "because all guns look alike," but he did admit he had left a gun in the apartment, saying that he had "stuck it under something" when the police arrived. He admitted also that he owned a brown leather jacket.

At the trial of the cause, Mrs. Williams, Peterson, Annie Borden, and the several police officers involved, testified to the facts substantially as heretofore related. Garrett, who was granted a severance and became a State's witness, testified that the automatic pistol was his and that he had purchased it at the time he was laid off at the restaurant. He said that Tajara had come to his home during the afternoon of November 12, 1961, asking to borrow the pistol and explaining that he needed it because he was going to collect some money that was owed to him. The witness said he first hesitated, but then gave the weapon to Tajara after the latter offered to pay him $50 for its use and to return it

the following day. The gun was never returned and Tajara purportedly said he did not want to talk about the matter when Garrett made inquiries. On cross-examination, Garrett denied that he had any part in or knowledge of the robbery, but did admit that he had, during the initial stages of investigation, denied giving the gun to Tajara. He explained his change of position by stating that he had since retained a lawyer who told him to tell the truth, and likewise conceded that the fact he had been granted a severance affected his decision and testimony. Apropos of the latter circumstance, the record reflects that the charges against him were nolle prossed after the jury returned its verdicts against his co-defendants.

Clyde Grace, another witness for the prosecution, testified that he and several friends customarily gathered at his home to drink and play cards, and that there had been such a gathering on the afternoon and evening of November 12, 1961. This witness and Jerry McCurley, who was also present, related that defendant had met there with Young and Tajara about 2:00 P.M., and that the three had departed after conversing in the kitchen for about 15 minutes. Defendant returned about 6:00 P.M. and, during the course of the evening, exhibited an automatic pistol to both Grace and McCurley which, according to the latter, looked like the pistol recovered in the Borden apartment. What time defendant left the Grace residence on this second occasion does not clearly appear, but we note the place was but a 10 to 15-minute ride from the restaurant where Williams was killed. There were no witnesses for the defense other than those who testified outside the presence of the jury on the character of the written statement.

While relying largely upon trial errors and his constitutional claims as requiring a reversal of the judgment of conviction, defendant advances the contention that he was not proved guilty beyond a reasonable doubt. It is his position that, due to the circumstantial nature of the evi-

dence against him, reasonable doubt of guilt must be found to arise from the fact that he had no "fruits of the crime" in his possession when he was arrested, and because Garrett's testimony was influenced by a purpose of gaining leniency and exoneration for himself. However, a conviction may be sustained upon circumstantial evidence as well as direct evidence, (*People* v. *Russell,* 17 Ill.2d 328,) it being necessary only that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime. (*People* v. *Magnafichi,* 9 Ill.2d 169; *People* v. *Grizzel,* 382 Ill. 11.) The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt. (*People* v. *Franklin,* 341 Ill. 499; *People* v. *Judycki,* 302 Ill. 143.) We do not see how the jury here could have reached any other conclusion than it did. Starting with the proof of the ballistics test which identified the murder weapon, there is an unbroken chain of evidence which placed the pistol in defendant's hands on the night of the crime. Coupled with this are his admission to the assistant State's Attorney that he entered into the robbery conspiracy, and his identification through the medium of his clothing that he was the person wielding the gun when the murder occurred.

Nor do we find that reasonable doubt arises because defendant had no money in his possession when arrested, or because Garrett, who supplied a relatively unimportant link in the chain of evidence, testified in hope of personal gain. As to the first circumstance, defendant had ample time to dispossess himself of the money and it is not unreasonable to infer that he had passed it on to his co-conspirators; as to the second, such a factor goes only to the weight and

credibility of Garrett's testimony, a function committed to the jury, (*People* v. *Clark,* 28 Ill.2d 423,) and we note here the jury was expressly instructed that the testimony of the witness was to be received with caution. Neither circumstance, when laid beside the other evidence in the case, gives rise to a hypothesis of innocence.

Although we are satisfied from the evidence that the jury was justified in returning a verdict of guilty, and that its action of inflicting the death penalty may well have been warranted, our review may not end with those conclusions, particularly since the jury did select the death penalty. Under our present Criminal Code, as was true in the past, the fixing of the death penalty is discretionary with the jury, (Ill. Rev. Stat. 1961, chap. 38, pars. 1—7(c)(1) and 9—1(b),) and where, in the exercise of such discretion, the jury has seen fit to inflict the death penalty, it has been consistently held this court cannot affirm that judgment, even though proof of guilt is clear, if prejudicial error occurred in the trial. (*People* v. *Oden,* 20 Ill.2d 470; *People* v. *Dukes,* 12 Ill.2d 334; *People* v. *Winchester,* 352 Ill. 237.) In the present case three separate contentions of trial error are advanced as having a direct relationship to the jury's selection of the death penalty.

The trial judge did not participate in the *voir dire* examination of the first panel of jurors, but did thereafter take part by questioning the remaining jurors as to whether they had religious or conscientious scruples against the infliction of the death penalty in a proper case. While the remaining jurors were being selected, some 161 were excused because they stated they would not impose the death penalty. In 40 separate instances where jurors so answered, the court summarily excused them, stating at various times: "Challenge for cause. I'll excuse you for cause.", or "You are excused for cause." Defendant concedes that the trial judge now has the primary duty of examining jurors as to their qualifications, (Ill. Rev. Stat. 1961, chap. 110, par.

101.24—1; *People* v. *Lobb,* 17 Ill.2d 287,) and likewise concedes that it is proper to qualify the jury for the death penalty in a capital case. (*People* v. *Winchester,* 352 Ill. 237; Ill. Rev. Stat. 1961, chap. 38, par. 743.) He complains, however, of the action of the trial judge in peremptorily and voluntarily exercising the challenge for cause, contending that it would appear to the jury (1) that the court, rather than the prosecution was qualifying the jurors for the death penalty, and (2) that the death penalty was the preferred verdict.

While this unprecedented contention is not without some surface appeal, it is our opinion on closer examination that the prejudicial effects claimed by defendant would not necessarily result. There was no great consistency in the pattern in which the challenges were exercised, the prosecution making the challenges in some instances and the court peremptorily exercising it in others, and we do not believe under the circumstances the jurors selected were left with any fixed impression that death was the preferred penalty. Indeed, all jurors selected and excused were asked only as to their views of the death penalty in a "proper case," clearly conveying the possibility that such a penalty might not be proper in this case. Moreover, we do not see how any different impression would be conveyed whether the prosecution affirmatively asked for the juror to be excused for cause, or whether the court did so of its own volition. In either case the ultimate decision was that of the trial court.

Advanced as being closely related to the foregoing claim, defendant next contends that improper forms of verdicts were submitted to the jury and that the court's instructions relative thereto were inadequate. Three forms of verdict were submitted to the jury. One embraced a finding of guilty and the fixing of the penalty at death; a second embraced only a finding of guilty and a finding of defendant's age; and the third embraced a simple finding of not

guilty. Involved indirectly is section 1—7(c)(1) of the Criminal Code which states: "Where, upon a trial by jury, a person is convicted of an offense which may be punishable by death, the jury may return a verdict of death. * * * Where such verdict is not returned by the jury, the court shall sentence the offender to imprisonment." (Ill. Rev. Stat. 1961, chap. 38, par. 1—7(c)(1).) Defendant contends that because the jurors were not instructed the court would impose the penalty if the second form of verdict was returned, and were not told that the penalty would be imprisonment, the prejudicial results occurring were: (1) the jury could believe that no penalty would be imposed even though a finding of guilty was returned; and (2) the jury was left with the impression that only the death penalty could be imposed. Apart from the inroads made into defendant's contentions by the rule that the burden is on the accused, rather than the trial court, to offer or request any form of verdict desired, (*People* v. *Wilson,* 1 Ill.2d 178, 189,) it is our opinion that the jury would be neither uninformed nor misled in the respects claimed. No juror of average intelligence would suppose defendant would go unpunished if the second form of verdict was returned, and we believe it to be a matter of common knowledge, constantly brought to the attention of the average citizen by various news media, that death is not the only penalty for the crime of murder in this jurisdiction. Moreover, when the first and second forms of verdict are read together, the jury was necessarily made aware that the death penalty was an optional form of punishment which it was free to select or reject as it saw fit.

At the immediate outset of the direct examination of Mrs. Williams, widow of the murder victim, the prosecutor, without objection by the defense, propounded specific questions which elicited answers that her present address was in Madison, Wisconsin; that she lived there with her four children and a baby sitter; that her oldest child was six

years and the youngest seven months; and that the youngest was the only one of the children born of her marriage to the deceased. During final argument to the jury, the prosecutor stated at one point concerning the decedent: "* * * he had a wife, he had a child and he had a right—he was only 20 years old when he died—to be with that family and to pursue his life and liberty." Defendant contends that such evidence and such argument, which he sees as relating to the punishment to be given to the consequences suffered by the victim's family, were irrelevant and highly prejudicial and served only to infuriate and inflame the jury against him.

A defendant's guilt must be established by legal and competent evidence, uninfluenced by bias or prejudice raised by irrelevant evidence and, in such connection, this court has consistently condemned the admission of evidence that the deceased left a spouse and a family, inasmuch as such evidence has no relationship to the guilt or innocence of the accused or the punishment to be inflicted upon him, but serves ordinarily only to prejudice him in the eyes of the jury. (*Filippo* v. *People*, 224 Ill. 212, 217; *People* v. *McMahon*, 244 Ill. 45; *People* v. *Gormach*, 302 Ill. 332; *People* v. *Jackymiak*, 381 Ill. 528; *People* v. *Dukes*, 12 Ill.2d 334.) From these cases has devolved the rule that where testimony in a murder case respecting the fact the deceased has left a spouse and family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence. In like manner, we have held that jury argument by the prosecution which dwells upon the decedent's family or seeks to relate a defendant's punishment to the existence of family is inflammatory and improper. *People* v. *Gregory*, 22 Ill.2d 601; *People* v. *Dukes*, 12 Ill.2d 334.

The People concede that the evidence of family elicited

from Mrs. Williams was irrelevant, but assert that prejudicial and reversible error did not occur because the evidence was brought to the jury only incidentally, and because no objection was made by the defense. As to the final argument, it is urged that no error occurred because the reference to decedent's family was fleeting, and because no effort was made to correlate defendant's punishment to the ill-effects suffered by the victim's family. We agree with the latter contention, but not the first. The evidence in regard to the decedent's child and step-children was not brought to the notice of the jury incidentally, but was presented by a series of questions in such a way as to permit the jury to understand that it was a matter material and proper to be proved. If any doubt existed, it was removed when the prosecutor went to the extreme of eliciting the ages of the children involved. This entire segment of the evidence, having no relevance to guilt or innocence, could only have had the purpose of prejudicing defendant in the eyes of the jury "and to arouse in them anger, hate and passion." (*People* v. *Dukes*, 12 Ill.2d 334, 340.) What part this inflammatory appeal to the jury played in the selection of the death penalty cannot be known. But defendant, no matter how reprehensible his crime, was entitled to have jurors consider both the matter of his guilt and punishment, uninfluenced by the circumstance that decedent's widow had been left to live alone with children of tender ages as the result of the homicide.

And while no objection was made by the defense to the admission of such evidence, we believe, apart from considerations of a later claim that defendant's counsel was incompetent for not objecting, that the irrelevancy and highly prejudicial nature of such evidence is so well established, that it was the duty of the court in a murder case to have refused it on its own motion. (*Cf. People* v. *Winchester*, 352 Ill. 237; *People* v. *Blevins*, 251 Ill. 381; *City of Chicago* v. *Pridmore*, 12 Ill.2d 447.) It is always the

duty of a trial court to control proceedings to insure that an accused receives a fair and impartial trial.

Other trial errors claimed, notably that the jury was improperly instructed and that the closing argument of the prosecution exceeded the scope of the argument of the defense, are not such as will recur on a new trial and will not be considered. Conversely, however, it is necessary to consider further assignments which might arise again.

Contention is made that it was error for the murder weapon to have been admitted into evidence because it was not found on defendant's person, because it was found in a place to which others had access, and because it was not discovered in the Borden apartment immediately after defendant's apprehension there. While defendant's possession of the gun, or lack of it, is a proper factor to be considered in determining its admissibility into evidence, (see: *People v. Selknes,* 309 Ill. 113; *People v. Berkman,* 307 Ill. 492,) possession is neither the sole test nor an absolute essential. Rather, as we pointed out in *People v. Jones,* 22 Ill.2d 592, 599: "The basic problem is one of relevance," and a gun "is relevant if there is evidence to connect it with the defendant and with the crime." It takes no further analysis of the evidence than already given to see that there was abundant evidence of such character in this case. What is more, defendant admitted that he had "stuck a gun under something in the Borden apartment," precisely where the murder weapon was found.

Drawing upon the line of decisions which have found error in the admission of evidence relating to crimes other than the one for which an accused is being tried, (*e.g., People v. Bridges,* 28 Ill.2d 165; *People v. Reed,* 287 Ill. 606,) defendant next contends it was reversible error to have admitted proof that he illegally entered the Borden apartment. However, it is a recognized exception to the rule relied upon that evidence which tends to prove any fact material to the issue on trial is competent even though

it may show the accused to have been guilty of another crime. (*People* v. *Tranowski,* 20 Ill.2d 11; *People* v. *Tomaszewski,* 406 Ill. 346; *United States* v. *Sebo* (7th cir.) 101 F.2d 889.) Here, the circumstances under which the murder weapon was discovered and connected to defendant were of the greatest relevance to the issue being tried.

Based upon what we feel to be an arduous construction of the Criminal Code which took effect January 1, 1962, (Ill. Rev. Stat. 1961, chap. 38,) defendant, although conceding the Code is silent on the matter, suggests the proper procedure in a capital case should be for the jury to deliberate separately, and to deliver separate verdicts, on; the issue of guilt and the matter of punishment. On this ground it is urged that the single-verdict procedure utilized in this case was improper. Separate verdicts dealing with guilt and punishment, or separate deliberations on the two subjects, have never been the practice in this State, and we believe that had it been the legislative intent to introduce such an innovation into capital cases it would have expressly said so. It is axiomatic that, generally, a statute should not be construed to effect a change in the settled law of the State unless its terms clearly require such a construction, (*Sternberg Dredging Co.* v. *Sternberg's Estate,* 10 Ill.2d 328,) and we find nothing in the new Code which clearly directs or requires the procedural change the defendant urges. Furthermore, we do not see, nor have we been told, how the single-verdict procedure results in any unfairness or prejudice to an accused.

For the reason stated, we conclude that the evidence of family fatally infected the trial and entitles defendant to a new trial. This conclusion makes it unnecessary for us to determine the issues raised by the writ to review the denial of post-conviction relief. However, we are constrained to remark, generally, that while the appointed counsel's qualifications and conduct of the trial itself appear to be consistent with what is required by due process, the scope and

manner of his investigation and preparation for the defense of one charged with a capital offense present a borderline case. Particularly is this true in light of disclosures on the post-conviction hearing that defendant was a diabetic, that he suffered from epilepsy until the age of 16 years and that he had the intelligence quotient for a child of 8 years and 9 months, all of which could conceivably have had a mitigating effect in the jury's selection of punishment.

The judgment of the criminal court of Cook County is reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

Mr. JUSTICE HOUSE, dissenting.