## People of the State of Illinois, Plaintiff-Appellee, v. Elder Mack, Defendant-Appellant.

### Gen. No. 69–137.

Fifth District.

February 26, 1970.

Hoagland, Maucker, Bernard & Almeter, of Alton (Donald L. Smith, of counsel), for appellant.

William J. Scott, Attorney General of State of Illinois, of Chicago, Morton E. Friedman, Assistant Attorney General, of Chicago, and R. W. Griffith, Jr., State's Attorney, of Edwardsville, for appellee.

GOLDENHERSH, J.

Defendant, Elder Mack, was tried by jury in the Circuit Court of Madison County, convicted of the crime of Murder and sentenced to the Illinois State Penitentiary for not less than 25 nor more than 65 years.

Robert Lee Lunsford testified that on Wednesday, June 19, 1968, at approximately 10:30 to 11:00 p. m., in response to a call from his daughter, he looked out a window and saw a taxicab standing in front of his home. Two doors of the cab were open. He went out to the cab and saw a man lying a short distance to its rear. He saw no one else in the vicinity of the cab. The police were called.

Delbert Clemons, a deputy sheriff of Madison County, was dispatched to investigate "a report of a cabdriver laying in the middle of the road," and he and his "riding partner" arrived at the scene at 11:33 p. m. He found a taxicab sitting in the middle of the road, the motor was running and both front doors were open. He found a man lying 55 paces from the vehicle. He could see two wounds in the man's back and one behind his right ear.

John Onesky, the riding partner, testified to substantially the same matters.

Demos Nicholas, a deputy sheriff, was present at the hospital when an autopsy was performed on the body of the cabdriver, identified as Swansey Martin. Dr. John Mueller, the pathologist, removed two bullets from the body and gave them to Nicholas. The bullets were placed in an envelope which was initialed by Nicholas and the doctor, and Nicholas delivered them to Chief Deputy Sheriff Frank Schmidt. He stated that a third bullet removed from the body was fragmented. Upon reference to his notes he testified he was in error when he stated he had given the envelope containing the bullets

151

to Schmidt. He stated that on June 22, 1968, he took the bullets and a Rohm revolver to the St. Louis, Missouri Police Department. The revolver was test-fired in his presence and the slugs from the gun were compared to the two in the envelope.

The slugs removed from the body of the deceased were returned to the sheriff's evidence room. On July 12, 1968, Nicholas took them and a different Rohm revolver to the St. Louis Police Department. He had been given the gun by Deputy Sheriff William (Dilly) Connors. He identified an envelope as containing several .22 caliber short bullets taken from the second gun. Further references to a weapon in this opinion are to this second revolver.

Dr. Mueller testified that upon examination of Martin's body he found three lethal bullet wounds, one to the head and two to the chest wall. The two bullets from the chest cavity were recovered "fairly intact," the bullet removed from the skull was fragmented. The two bullets were marked by use of a hemostat to make a slash across the base.

Robert Rizzi, a deputy sheriff, testified that on August 5, 1968, he received an envelope from the St. Louis Police Department, placed it in the evidence room, and when Nicholas returned from vacation he again took charge of the sheriff's evidence room. This envelope contained a revolver, bullets taken from the revolver, and the two slugs removed from the body.

Detective Paul Reeder, a firearms examiner for the St. Louis Police Department, testified he received the revolver, bullets and slugs from Nicholas on July 12, 1968, and returned them to Rizzi on August 5, 1968.

Detective Joseph Brasser, a firearms examiner with the St. Louis Metropolitan Police Department, testified he had been with the police department for 15 years, had been trained for two years by another firearms

examiner, was an instructor on firearms for 3 years, and had been a gunner's mate in the Navy. He had been an examiner for 3½ years. He described the method used in making a ballistics test and stated that in his opinion the slugs removed from the body were fired from the revolver.

On cross-examination he described the Rohm revolver as being a fairly common weapon of German origin, priced approximately $12 to $22. He stated that in comparing two such guns manufactured in close sequence the number, twist and width of the grooves would be the same but the striations would be different. The Rohm guns are peculiar in that they have 8 "lands" and "grooves" with a right twist.

William Connors testified that a lady named Betty Mack gave him the gun in question sometime in July and he gave it to Demos Nicholas. Nicholas made a record of the serial number.

A clerk in a store in Alton produced its record of firearm sales. An entry made by him showed the gun to have been sold to defendant on June 17, 1968. He identified defendant as the purchaser. The record showed the sale of six Rohm guns in a short period of time. The serial numbers indicated manufacture at approximately the same time.

Patricia Atwood, a driver and dispatcher for American Cab Company, testified that on June 19, 1968, at approximately 11:10 p. m., she had dispatched Martin's cab to the area where the cab and body were found.

Mrs. Betty Mack, an aunt of the defendant, testified she was given the revolver or one similar to it by defendant's brother a day or two before she turned it over to Connors.

Mrs. Mary Mack, wife of defendant's brother, George, testified that in June of 1968 she and George were living in Evanston. Defendant came to their home late one

153

night in June and later told her he had given her husband a gun. She could not identify the gun in evidence as being the same one.

Marjorie Christeson testified that on June 19, 1968, at approximately 8:00 p. m. defendant and another man came to the taxicab office operated by the witness and her husband. With these two men as passengers, she dispatched a cab to an address in St. Louis. The cab was gone about 15 minutes.

Jack Canaday testified he drove the cab on the occasion described by Mrs. Christeson. He could not identify the defendant. He drove across the river to St. Louis and discharged his passengers at the "first crossover" of the highway. There were no buildings at the place where his passengers alighted from the cab.

Defendant testified that he had bought a gun similar to the one in evidence on a Monday. He placed it in his dresser and did not see it again until Wednesday or Thursday when he took it to his brother's house in Chicago. He lived in Chicago for several weeks and then moved back to Alton with his brother and his wife. He denied being in the vicinity of the homicide. His room and dresser were open at times when he was not there.

Following defendant's testimony, the court admitted, without objection, an exhibit showing defendant had been previously convicted of the offense of Theft and sentenced to the penitentiary.

We shall first consider defendant's contention that The People failed to prove beyond a reasonable doubt that a crime had been committed and failed to prove that the accused had committed it. Defendant argues the trial court erred in denying his motions for directed verdict.

In our opinion the evidence of defendant's purchase of the gun two days prior to the date of the

shooting, the testimony of the firearms examiner and the evidence of defendant's being in the Alton area on that night are sufficient to support the guilty verdict. As stated in The People v. Bernette, 30 Ill2d 359, 197 NE 2d 436, at page 367, "The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt."

■ Defendant next contends the slugs and pistol were admitted in evidence without proper foundation, arguing there is insufficient evidence that they were in the same condition at trial as at the time of the occurrence. He also contends the witness lacked the qualifications requisite to expression of an expert opinion. Both contentions are adequately answered in The People v. Fisher, 340 Ill 216, 236, 172 NE 743.

Defendant contends that certain testimony elicited from Mrs. Christeson and Jack Canaday, and a comment of the State's Attorney during final argument, to all of which objections were sustained, were so prejudicial, that despite the court's rulings he was deprived of a fair trial.

During the direct examination of Mrs. Christeson the record reflects the following:

Q. "Just relate what the conversation was between you and the Defendant."

A. "As I remember it this boy asked how much it was across the bridge."

Q. "Did you dispatch the cab?"

A. "Yes, I did."

Q. "Did you do anything before you dispatched the cab?"

A. "Yes, I asked the driver to please leave his money with me."

MR. TRONE: "I object to that, Your Honor."

155

THE COURT: "The objection is sustained and the answer is stricken and the Jury is instructed to disregard it."

MR. SCROGGINS: "What did the driver do before he left?"

A. "He left his money with me—his bills, not his change."

Q. "Why did he do that?"

MR. TRONE: "I object."

THE COURT: "Objection sustained."

MR. SCROGGINS: "Was the cab dispatched?"

A. "Yes."

Q. "Do you know how long the cab was gone?—just answer yes or no."

A. "Approximately I would say, ten—maybe fifteen minutes; the next call came in at 8:10."

. . . . . .

Q. "When you dispatched the cab where did you dispatch the cab to?"

A. "Just across the bridge into Missouri."

. . . . . .

MR. SCROGGINS: "Did you have another destination for this cab earlier, this same cab and these same people?"

MR. TRONE: "I object."

THE COURT: "Objection overruled."

MR. SCROGGINS: "The same people and the same cab, did you have a different destination earlier?"

A. "I was first asked . . ."

MR. TRONE: "I object."

THE COURT: "The objection is sustained."

MR. SCROGGINS: "Just state whether you had a different destination with these same two people and this cab?"

A. "Yes."

156

Q. "What destination was that?"

A. "St. Louis."

Q. "Where in St. Louis?"

A. "Broadway and Taylor."

Q. "When did this destination change?"

MR. TRONE: "I make objection to that."

THE COURT: "The objection is sustained."

The following appears in the direct examination of Jack Canaday:

Q. "Did you observe anything when you turned around and came back, you did turn around and come back?"

A. "Yes."

Q. "Did you observe anything when you turned around and came back?"

MR. TRONE: "I object."

THE COURT: "Objection overruled."

WITNESS: "Yes, I did."

Q. "What did you observe?"

A. "The same two men on the other side of the highway hitchhiking back to Alton."

MR. TRONE: "I object."

THE COURT: "The objection is sustained as to the last answer, the last part of that answer and the Jury is ordered to disregard it."

MR. SCROGGINS: "Did you see any individuals when you turned the cab around?"

A. "As I turned the cab around?"

Q. "Yes."

A. "No, sir. You see, I had to drive further up the road to the next crossover, the crossover on the other side of the divided highway."

Q. "Did you see the two people then?"

A. "Yes."

Q. "What were they doing?"

A. "They were hitchhiking."

MR. TRONE: "I object to that."

157

THE COURT: "The objection is sustained."

During Canaday's testimony on redirect the following occurred:

MR. SCROGGINS: "Did you do anything before you left the cab office?"

MR. TRONE: "I object."

THE COURT: "Objection sustained."

During final argument the record shows the following:

"If you believe the testimony of Mrs. Christeson he went to a cab company in Alton in the company of another individual—that a destination was fixed in St. Louis—that the cabdriver was asked to remove the money from his pocket."

MR. TRONE: "I object."

THE COURT: "The objection is sustained."

MR. SCROGGINS: "I submit to you, Ladies and Gentlemen of the Jury that Elder Mack bought a 22-caliber Rohm gun on the 17th day of June, 1968—that he was in Alton, Illinois, on the 19th day of June, 1968—that he took one cab ride which was unsuccessful."

MR. TRONE: "I object to that, Your Honor."

THE COURT: "Objection sustained as to that form of the argument."

MR. SCROGGINS: "That he took a second cab ride."

MR. TRONE: "I object to the reference that he is attempting to make."

THE COURT: "It's argument."

■ ■ This court is reluctant to reserve a judgment based upon evidence sufficient to sustain it, but it is our duty to do so when the record shows defendant did not receive a fair trial. It is true the court sustained the objections of defense counsel to the testimony of Mrs. Christeson that she had asked the cabdriver to leave his money with her, but in our opinion

the cumulative effect of the insinuations of the questions and the argument are so prejudicial as to have effectively deprived defendant of a fair trial. The People v. Lewis, 313 Ill 312, 320, 145 NE 149. He is entitled to a trial by a jury uninfluenced by improper testimony or argument, and the judgment is accordingly reversed and the cause remanded for a new trial.

Defendant has argued other alleged errors which are not discussed for the reason that they are not likely to recur upon retrial.

The court is appreciative of the excellent brief and argument of appointed counsel.

Judgment reversed and cause remanded for new trial.

MORAN and EBERSPACHER, JJ., concur.