2022 IL App (1st) 201345-U

SECOND DIVISION
June 30, 2022

No. 1-20-1345

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18 CR 962 |
| | ) | |
| MICHAEL WHITEHEAD, | ) | |
| | ) | Honorable James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

ORDER

¶ 1     *Held*: We affirm the judgment of the trial court. Defendant was not denied a fair trial based on the discussion of the victim as a mother with surviving family or by the comments made by the State during its arguments; defendant did not receive ineffective assistance of counsel; defendant did not establish that the trial court committed any error when rendering the sentence in this case.

¶ 2     Defendant Michael Whitehead was found guilty of first-degree murder in the shooting death of Shari Graham. Defendant appeals both his conviction and his sentence. Defendant argues he was denied a fair trial due to improper arguments by the prosecutor, that he received

ineffective assistance of counsel, and that his sentence was improper. Finding no reversible error, we affirm.

¶ 3                                    BACKGROUND

¶ 4      On February 26, 2016, Shari Graham, her children, and her boyfriend were visiting her boyfriend's mother at her residence in the Wentworth Gardens community in Chicago. Graham left the residence to go and get dinner for the family. She planned to take a taxi. As she was getting into the taxi, gunshots rang out. Graham got into the cab and told the taxi driver that she had been shot and she also called her boyfriend to inform him.

¶ 5      The taxi driver started driving towards the hospital and he was able to flag down an ambulance that was stopped at a red light on the way. The paramedics transferred Graham into the ambulance and assessed that she had been shot in the back. Graham was not breathing and did not have a pulse. She was taken to the hospital and pronounced dead. An autopsy revealed that the bullet entered Graham's back, traveled through her lung, and then entered the left ventricle of her heart.

¶ 6      Patrick Curry was working as a security guard at Wentworth Gardens the night of Graham's death. He and his partner heard seven to eight gunshots, and they traveled in the direction of the gunfire. As they traveled towards the location of the gunshots, Curry observed Natrell Jackson and another man exit the back stairwell of 3801 S. Princeton. Curry knew Natrell Jackson and defendant by sight because of his work at Wentworth Gardens. Jackson, a co-defendant in this case, was wearing a distinctive Pelle Pelle jacket and Jackson looked directly at Curry. Curry was unable to see the second man well enough to identify him. Curry's partner called the police. Chicago Police officers arrived and talked to witnesses, photographed the crime scene, and recovered a fired bullet and bullet casings.

¶ 7      Curry identified Natrell Jackson in a photo array shortly after the shooting as the person he saw in the distinctive jacket coming out of the stairway after the shooting. Curry also knew defendant Whitehead because of Curry's work at Wentworth Gardens. Curry identified defendant in a photo array as someone he had seen in the area about an hour before the shooting. Curry did not identify defendant as being the man with Jackson coming out of the stairway, as he did not see that person well enough to make an identification. Curry similarly stated that he did not really recognize defendant in court, noting that defendant had cut his distinguishing dreadlocks.

¶ 8      Semaja Weathersby previously lived at Wentworth Gardens and grew up with Natrell Jackson and defendant. He was with Jackson and defendant on the day of the shooting. Weathersby and Jackson were smoking cannabis during the day, and they went to a gas station to get some blunts. Weathersby acknowledged that it was he and Jackson captured on surveillance video together at the gas station around 6:30 pm. Jackson was wearing a distinctive orange and blue Pelle Pelle jacket in the gas station surveillance video.

¶ 9      Three hours later, Weathersby, Jackson, and defendant were hanging out in a courtyard at Wentworth Gardens, smoking a blunt. Weathersby acknowledged that it was the three of them captured on surveillance video together in the courtyard at that time. Weathersby saw two vehicles driving southbound on Princeton that caught his attention and he believed the people in the vehicles were rival gang members. Defendant and Jackson ran towards Princeton, and Weathersby ran behind them. Surveillance video showed the subject vehicles driving southbound on Princeton and showed defendant, Jackson, and Weathersby running to the street, followed by flashes.

¶ 10    At trial, Weathersby testified that he did not recall what Jackson and defendant did after they ran towards the vehicles. However, when he testified before the grand jury in this case, Weathersby testified that the three of them ran to Princeton and that defendant and Jackson pulled out guns and began firing at a vehicle.

¶ 11    Weathersby was arrested on an unrelated trespassing charge two weeks after the shooting. After his arrest, investigators talked to him about the shooting. Weathersby picked out Jackson and defendant's pictures from separate photo arrays and indicated in writing on the identification forms that he knew defendant and Jackson well, that the three of them hung out on the night of the shooting, and that defendant and Jackson were shooting guns that night—shooting at a car that drove past. Weathersby gave a video-recorded statement to an Assistant State's Attorney in which he stated that, after the two cars pulled up, defendant and Jackson "started standing in the street, started shooting."

¶ 12    Surveillance video obtained from the Chicago Housing Authority showed three men in the courtyard behind 3801 S. Princeton. Another angle shows two vehicles driving southbound on Princeton and the three individuals running to the street. Two of the individuals go out into the street, while one of the men remains on the sidewalk. The two men standing in the street fire numerous shots in the direction of the vehicles, and then the three men all run back around to the rear of 3801 N. Princeton and enter the building.

¶ 13    When officers recovered the surveillance video from the CHA and the gas station, they showed still-frame photographs from the video to Officer David Carey who was familiar with Wentworth Gardens because it was his assigned territory. Officer Carey confirmed the identities of Jackson and Weathersby on the gas station video. Officer Carey noticed that Jackson was wearing a distinctive Pelle Pelle jacket in the photographs and took note of Jackson's attire

because he was familiar with that brand of jackets and had never seen two Pelle Pelle jackets with the same pattern. After confirming the identity of the two men and knowing that they were together on the day of the shooting, officers spoke with Weathersby to find out more about the shooting.

¶ 14    Defendant and Jackson were arrested on March 10, 2016. The next day, detectives went to Jackson's home to interview his mother, and they asked her for his orange and blue Pelle Pelle jacket. Jackson's mom gave the jacket to the detectives. Forensic analysis of the ballistics evidence showed that seven of the cartridge cases that were recovered were fired from one firearm, while five of the recovered cartridges were fired from a second firearm.

¶ 15    Before trial, defendant moved to bar evidence that Shari Graham was pregnant at the time she was killed and to bar evidence that she was a mom. Defendant argued that evidence of Graham's pregnancy and motherhood was irrelevant, unnecessary, and inflammatory. The State agreed that it would not introduce evidence that Graham was pregnant, but it argued that it should be allowed to introduce evidence that Graham was a mom to explain what she was doing at that location at the time she was killed. The trial court ruled in favor of the State.

¶ 16    During its opening statement, the State pointed out that a bullet "enter[ed] the body of a young mother." The State told the jury that Graham, her boyfriend, and their three children were visiting the boyfriend's mother and that Graham left to go get in a taxi because her "young son wanted chicken for dinner." Lamont Woods, Graham's boyfriend, testified that he and Graham had been together for 12 years and had three children together, aged nine, six, and four. He testified that Graham left to go get dinner for the family at Popeye's. Woods identified Graham in a photograph and opined that Graham was "always smiling and just the nicest person you want to know, man. Just the best mother you will want to know, best friend you ever want to know."

5

During its closing argument, the State told the jury that Graham "will never be able to tuck her children into bed again."

¶ 17 The jury found defendant guilty of first-degree murder. The jury also found that defendant personally discharged a firearm during the commission of the offense. The trial judge noted defendant's youth at the time of the offense and sentenced him to 24 years in prison. The trial judge elected to not apply the firearm enhancement to defendant's sentence. Defendant appeals both his conviction and his sentence.

¶ 18                                    ANALYSIS

¶ 19 Defendant raises four main issues on appeal. He argues: (1) he was denied a fair trial because the State highlighted that the victim was a mother and appealed to the jury's emotions; (2) he was denied a fair trial because the State made inflammatory arguments, used racist language, defined the jurors' role for them, and mischaracterized the law and the facts; (3) that counsel was ineffective for failing to point out that a detective violated the statute governing lineup procedures (725 ILCS 5/107A-0.1 *et seq*. (West 2020)); and (4) that the trial court failed to properly address defendant's youth when it sentenced him.

¶ 20                        I. Discussion of the Victim as a Mom

¶ 21 Defendant contends that the State's argument and evidence about Shari Graham being a mother and a girlfriend was portrayed as being material, and that he was denied a fair trial because the State "inflamed the jury by pulling its heartstrings." Defendant argues that the surviving-family evidence was irrelevant because the issue in the case was the identification of the shooter, so the victim's family life did not matter to the question of guilt or innocence. Defendant further argues that the surviving-family evidence, as a whole, was overly prejudicial such that he was denied a fair trial that was based solely on the evidence.

¶ 22    The State argues that defendant failed to object to the prosecutor's statements about Graham's motherhood and therefore forfeited his right to argue on appeal that the statements constituted error (citing *People v. Wheeler,* 226 Ill. 2d 92, 122 (2007)). Prior to trial, however, defendant filed a motion *in limine* seeking to prevent the introduction of evidence about Graham's surviving children. Defendant then argued in his posttrial motion that evidence of Graham being a mother of three should have been excluded. Defendant quoted the State's opening statement, closing argument, and rebuttal. He argued that the State improperly emphasized the familial evidence and, as a result, prejudiced defendant. In criminal cases, our supreme court has held consistently that a defendant preserves an issue for review by (1) raising it in either a motion *in limine* or raising a contemporaneous trial objection, and (2) including it in the posttrial motion. *People v. Denson*, 2014 IL 116231, ¶ 11. In this case, defendant raised the issue in his motion *in limine* and in his posttrial motion, therefore defendant preserved the issue for review. See *People v. Jackson*, 2017 IL App (1st) 151779, ¶ 19.

¶ 23    Our supreme court has addressed the admission of evidence about surviving family members and cautioned against its use in criminal trials. Evidence that the deceased has a surviving spouse or family generally has no relationship to the guilt or innocence of the accused and normally serves only to prejudice the defendant in the eyes of the jury. *People v. Hope*, 116 Ill. 2d 265, 275 (1986). When such evidence is not elicited incidentally but is presented in such a manner as to cause the jury to believe it is material, its admission is prejudicial and can constitute reversible error. *Id*. If the prosecution dwells upon the decedent's family or seeks to relate a defendant's punishment to the existence of family, the State's conduct is improper. *Id*.

¶ 24    However, murder victims do not live in a vacuum and, in most cases, they leave behind family members. *People v. Kitchen*, 159 Ill. 2d 1, 33 (1994). Evidence of a victim's family

relations is admissible to the extent it is necessary to properly present the prosecution's case. *People v. Cloutier*, 156 Ill. 2d 483, 508 (1993). Thus, our supreme court has explained that we must recognize a distinction between situations where the jury is made aware of the family left behind and cases where the prosecution has dwelt upon the deceased's family to the point that the jury would relate such evidence to the defendant's guilt. *Id.* The trial court's rulings on the admission of evidence are reviewed for an abuse of discretion. *People v. Fillyaw*, 2018 IL App (2d) 150709, ¶ 44.

¶ 25    In this case, the State referred to Graham as "a young mother" during its opening statement. The State told the jury that Graham, her boyfriend, and their three children were visiting the boyfriend's mother and that Graham left to go get in a taxi because her "young son wanted chicken for dinner." Lamont Woods, Graham's boyfriend, testified that he and Graham had been together for 12 years and that they had three children together, aged nine, six, and four. He testified that Graham left to go get dinner for the family at Popeye's. Woods described Graham in the close of his testimony as "always smiling and just the nicest person you want to know, man. Just the best mother you will want to know, best friend you ever want to know." During its closing argument, the State told the jury that Graham "will never be able to tuck her children into bed again," and the State again described the decedent as a young mother in its rebuttal argument.

¶ 26    Defendant argues that the State's argument and the evidence that was admitted about Graham being a mother and a longtime girlfriend was presented to the jury as being material. We disagree.

¶ 27    Despite defendant's characterizations to the contrary, in the context of the entire trial, the references to Graham as a mother and girlfriend were relatively brief and were never portrayed

8

as indicia of defendant's guilt or innocence. "Unlike the cases in some decisions of this court where comments regarding the victim's family required reversal of the conviction, the prosecutor did not dwell on the actual or supposed reaction of the victim's family." *People v. Johnson*, 149 Ill. 2d 118, 142 (1992) (citing *People v. Bernette*, 30 Ill. 2d 359, 372 (1964)). The trial court did not abuse its discretion when it ruled that evidence of Graham being a mother could be admitted, as it correctly found that the evidence was necessary to understand the circumstances of the case and why the victim was hailing a cab when she was shot. See *Cloutier*, 156 Ill. 2d at 508.

¶ 28    Lamont Woods answered several background questions at the outset of his testimony that included questions about himself, his children, and his relationship with his late girlfriend. Those background questions had no bearing on defendant's guilt or innocence nor were they portrayed as such. *People v. Lavelle*, 396 Ill. App. 3d 372, 380 (2009). Woods' testimony established that he knew and could identify the victim and he provided proof that she in fact, was alive, but died during the event in question. His background testimony was permissible as "life and death" testimony. See *People v. Williams*, 209 Ill. App. 3d 709, 717 (1991) (the State is permitted to introduce full proof of the crime charged in the indictment and to call life and death witnesses to identify the victim and provide evidence to establish her death); see also *People v. Harris*, 225 Ill. 2d 1, 32 (2007). Woods' testimony informed the jury about some background details of his family, and then he moved on to testify about the events that occurred just before Graham died. See *People v. Free*, 94 Ill. 2d 378, 415 (1983); *People v. Oliver*, 306 Ill. App. 3d 59, 73 (1999).

¶ 29    Woods provided testimony about the day of the shooting that explained why Graham was present at the location where she was killed. Woods was one of the last people to see Graham alive and she called him from the taxi after being shot. He explained that he and Graham were at Wentworth Gardens with their children to visit his mother and that the victim was leaving to get

dinner for the family when she was shot and killed. His testimony explained Graham's location and why she was leaving in a taxi when she was shot, which was necessary to the jury's understanding of the crime—that Graham was a victim simply because she was in the wrong place at the wrong time. The bulk of Woods' testimony was about the occurrence and the timeline leading up to the shooting rather than being about the impact of Graham's death on him or the family. Even when Woods offered up an impromptu statement about Graham being a great mother and a great friend, the statements were incidental and not calculated, and they were not presented in such a manner as to cause the jury to believe this fact to be material as to the defendant's guilt. *Free*, 94 Ill. 2d at 415.

¶ 30    Additionally, some of the references to Graham being a mother were made in response to inquiries leveled by the defense in its own closing. In his closing argument, defendant argued that Weathersby's statement to police should be questioned by the jury because he was interrogated for six hours. Defendant further argued that the investigation by the police was unsatisfactory and left doubt about his guilt. The prosecution defended the police's investigation and expressed that society should want its police officers to vigorously investigate when a young mother is gunned down. During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel which clearly invite response, and comment on the credibility of witnesses. *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 57. In reviewing whether comments made during closing argument are proper, the closing argument must be viewed in its entirety and remarks must be viewed in context. *Id.* In this case, it cannot be said that the State's comments were outside the bounds afforded to prosecutors in making arguments. The jury was instructed that the opening statement and closing argument were not evidence and that its role

was to evaluate the evidence admitted. The prosecutor's comments concerning the victim's family and the similar evidence that was admitted were merely incidental to the presentation of the State's case and were not deliberate misconduct to inject irrelevant and prejudicial matters into the trial. *Cloutier*, 156 Ill. 2d at 508.

¶ 31 Defendant relies heavily on our supreme court's decision in *People v. Hope*, 116 Ill. 2d 265 (1986). In *Hope*, the supreme court found that the State's introduction of evidence about the deceased's spouse and family prejudiced the defendant and denied him a fair trial. *Id*. at 277-78. The court found the State to have improperly appealed to the emotions of the jurors in a manner that led the jury to believe the evidence about the surviving family members was material. *Id*. The court remarked that because there were numerous references throughout direct testimony and argument regarding the murder victim's young children, the defendant was prejudiced and entitled to a new trial. *Id*. at 279. Defendant likewise relies upon *Bernette*, 30 Ill. 2d at 371-72, which the *Hope* court described as analogous and in which the court found that the admission of surviving-family evidence was done intentionally with the purpose of arousing the passions of the jury. *Id*. at 372.

¶ 32 Both *Hope* and *Bernette* were cases that involved the death penalty, and in both cases the court noted the fact that the death penalty was on the table when it assessed the prejudicial impact of the evidence. In this case, there was a single witness that acted as a life-and-death witness to identify the victim. The *Hope* court discussed that the key in these cases is the manner in which the surviving family evidence is elicited. *Hope*, 116 Ill. 2d at 276. The testimony here was offered in response to procedural background questions and was not presented to the jury as anything more than information about the background of the victim and then as illustrating the circumstances that led the victim to be at the location where she was killed. The State never

urged the jury expressly or implicitly to find defendant guilty because Graham left behind a boyfriend and children.

¶ 33    The State did not place undue emphasis on the fact that Graham left a surviving family. The surviving-family evidence was a very small part of the trial and served a legitimate purpose without being used for the sole purpose of prejudicing the defendant in the eyes of the jury. In the context of the entire trial, Graham's role as a mother and a girlfriend was not overemphasized or portrayed as meaningful to the question of guilt. The State called several witnesses during its case in chief and Woods was the only witness to testify about Graham's familial roles. The references to Graham as a mother and a girlfriend were brief and had a relevant connection to the circumstances surrounding the murder. The State did not dwell upon the surviving family. We find the cases cited by the State on this subject to be more applicable and persuasive than the cases cited by defendant. Compare *Cloutier*, 156 Ill. 2d at 508; *Free*, 94 Ill. 2d at 414-15; *Lavelle*, 396 Ill. App. 3d at 379-80; with *Hope*, 116 Ill. 2d at 276-78; *Bernette*, 30 Ill. 2d at 371-72.

¶ 34    Defendant was convicted based on his identification as the shooter by Weathersby, the testimony of Curry, and on highly corroborative video surveillance evidence. Neither the trial court's evidentiary ruling nor the State's argument or presentation of evidence constituted an abuse of discretion or denied defendant a fair trial.

¶ 35         II. Inflammatory Argument, Racism, Mischaracterizing the Law

¶ 36    Defendant argues that he was denied a fair trial because he was prejudiced by the comments about the victim's surviving family and because the State: misrepresented a piece of evidence, used racist language, improperly defined the jurors' role, and misstated the law.

Defendant acknowledges that no objection was raised at trial and these errors are forfeited, but he asks us to review the issues for plain error.

¶ 37 Under plain error review, we will grant relief to a defendant on otherwise-forfeited issues in either of two circumstances: (1) if the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant or (2) if the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 178–79 (2005). The plain error doctrine is not a general savings clause preserving all errors affecting substantial rights whether or not they have been brought to the attention of the trial court. *People v. Gray*, 215 Ill. App. 3d 1039, 1050 (1991). Rather, it is a narrow and limited exception to the general waiver rule and its purpose is to protect the rights of the defendant and the integrity and reputation of the judicial process. *Herron*, 215 Ill. 2d at 177.

¶ 38 Defendant argues the evidence is closely balanced and therefore we will review defendant's forfeited claims under the first prong of plain error. However, before considering whether the plain-error exception applies, we must first determine whether any error occurred. *Id*. at 187; *People v. Johnson*, 218 Ill. 2d 125, 139 (2005). Defendant re-argues his claim of error about the admission of surviving-family evidence. His arguments are adequately addressed by our prior analysis. See *supra*, Part I.

¶ 39 Defendant contends that the State improperly argued outside the evidence when it asserted that one of the CHA surveillance videos tracked defendant all the way from the murder scene to his home. Defendant posits that the video did not show the individuals going "all the way" to defendant's house, because it showed them on a sidewalk right in front of defendant's home that branched out with one path going to defendant's home, but the other path going to a

neighbor's home. There was testimony from Detective Carey that supported the State's argument. The fork in the path split just a few feet from defendant's front door. We find the comment to be reasonable based on the evidence and inferences that can be drawn therefrom, and we find no error.

¶ 40    Defendant argues that the State improperly defined the jury's role during its rebuttal argument when it told the jury that "Graham and her family, they don't need sympathy. What they need is justice." The State later implored the jury to give justice for Shari Graham and explained that "justice for Shari Graham means finding the defendant, Michael Whitehead, guilty of first-degree murder." This court and our supreme court have previously found analogous statements to not constitute reversible error. See, *e.g.*, *People v. Barrow*, 133 Ill. 2d 226, 269-70 (1989); *People v. Goins*, 2013 IL App (1st) 113201, ¶¶ 92-93. We find that the State's comment about the jurors' role in the context of the entire case was not error here.

¶ 41    Defendant argues that "the State also improperly introduced into the trial a racist trope." Defendant contends that the prosecutor "called his codefendant a boy," and that this label "has been used to demean African-American men, among others, throughout American history" (quoting *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1142 (10th Cir. 2008)). Defendant acknowledges that, "[n]o doubt the prosecutor did not intend a racial message," but he argues that the prosecutor's reference to his codefendant undermined the dignity of the proceedings and contributed to defendant being denied a fair trial.

¶ 42    The prosecutor was discussing defendant and his codefendant both altering their appearances after the shooting to imply that their efforts to change their hairstyles and appearances right after the shooting showed a consciousness of guilt. When discussing the codefendant's change in appearance, the prosecutor stated "you know who also changed his

appearance? Natrell Jackson." The prosecutor continued, "if you didn't actually know this boy, maybe you wouldn't even recognize him." Defendant was 16 years old at the time of the shooting and his codefendant was young too.

¶ 43    Defendant's argument is based on the cold record and lacks any indication about the tone, emphasis, or other characteristics of the remark. Defense counsel did not object to the comment, which would seem to strongly indicate that the statement was not interpreted as racist by those who heard it. Defense counsel similarly did not raise the issue in a posttrial motion, which again, would seem to indicate that the remark was not interpreted to be racist, even by defendant's own advocate. The trial judge similarly did not react to the comment. Within the context of the argument, as defendant acknowledges, the comment was directed at the party's youth, not his race. There is no reason to believe that the jury interpreted some form of racism inherent in the remark where no one at trial seemed to take note of the remark. See *People v. Brooks*, 246 Ill. App. 3d 777, 784 (1993) (statements in closing arguments must be viewed in context, and we are not obligated to assume that the jury accepted a comment's most damaging meaning).

¶ 44    Defendant also argues that the State improperly undermined the presumption of innocence and misstated the law. Defendant points to comments by the State in its closing argument in which it was discussing how Weathersby changed his story at trial from what he had told investigators and the grand jury. The State noted that the jury should consider Weathersby's previous statements as more credible because he gave them at a time when "the murderer wasn't sitting in front of him" but that during trial "he has the murderers, defendant Whitehead and defendant Jackson, staring at him." Defendant argues that labeling him as a murderer without reference to the evidence improperly presumed his guilt. Defendant also contends that the State improperly characterized the law on prior inconsistent statements by stating that the law took

into account that the prior statement was made when a murderer was not sitting in front of the declarant.

¶ 45    There is no *per se* prohibition on a prosecutor calling a defendant "a murderer" during closing argument in a murder case if the comment is properly based on evidence admitted at trial. *People v. Ganter*, 56 Ill. App. 3d 316, 326 (1977); see also *People v. Jackson*, 2012 IL App (1st) 092833, ¶ 45. The State's *argument* about its characterization of defendant did not undermine the presumption of innocence.

¶ 46    The State's comments about Weathersby's prior inconsistent statements and the law governing prior inconsistent statements were similarly not error. The prosecution sought to explain to the jury why Weathersby testified confidently before a grand jury that defendant was a shooter in this case but then was reluctant to testify in the same way at trial. Defendant attempts to parse the prosecutor's words as if the prosecutor was misleading the jury on the law but the entire argument, in context, belies that assertion. Just before making the statement in question, the prosecutor accurately quoted the pattern instruction for prior inconsistent statements. The prosecutor then urged the jury to find the grand jury testimony more credible than the trial testimony because Weathersby gave the testimony at a time when defendant was not sitting in front of him. The prosecutor did not imply that the law presumed defendant was guilty before the statement could be used at trial. The jury was instructed that the parties' arguments were not evidence and that the court would instruct the jury on the applicable law. The jury was not misled about the law by these remarks. Defendant is not entitled to relief for plain error based on any of the above-referenced comments.

¶ 47    Alternatively, defendant argues that his trial counsel was ineffective for failing to object and raise the issues about the State's closing argument in order to preserve the issues for review.

The United States Constitution guarantees criminal defendants the right to effective assistance of counsel. U.S. Const. Amend. VI (West 2020). To be entitled to relief on a claim of ineffective assistance of counsel, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *People v. Scott*, 2015 IL App (1st) 131503, ¶ 27. The failure to satisfy both prongs of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Patterson,* 192 Ill. 2d 93, 107 (2000). We analyze claims of ineffective assistance of counsel by considering the entire record. *People v. Hommerson*, 399 Ill. App. 3d 405, 415 (2010).

¶ 48 Because we have found that defendant raised no error in the subject arguments, he has not shown an entitlement to any relief for ineffective assistance of counsel. See *People v. Moon*, 2019 IL App (1st) 161573, ¶ 47 (no relief for ineffective assistance where there was no error); *People v. Land*, 2011 IL App (1st) 101048, ¶ 146.

¶ 49 III. Counsel's Failure to Disclose a Violation of the Eyewitness Identification Statute

¶ 50 Defendant argues that he received further ineffective assistance from his trial counsel where counsel failed to disclose that a detective violated the statute governing lineup procedures (725 ILCS 5/107A-0.1 *et seq*. (West 2020)) during the investigation in this case. Defendant points out that the defense's strategy at trial was "to attack the police investigation," but that his trial counsel failed to reveal that investigators violated a statute when they allowed Weathersby to refuse the recording of his identification of defendant. Defendant contends that officers were required to either record video or record audio of Weathersby's identification and, because the identification was not recorded on media, we should have no confidence in the verdict and reverse defendant's conviction.

¶ 51      The parties agree that Weathersby refused consent for his identification to be videorecorded or audio recorded—he opted out of any recording. The Photo/Lineup Advisory Form in this case indicated that Weathersby refused consent for his identification to be recorded. The Code of Criminal Procedure requires a lineup identification to be videorecorded unless it is not practical or the eyewitness refuses to allow a video record to be made. 725 ILCS 5/107A-2(h) (West 2020). If the eyewitness refuses a video record, then the reasons for the refusal must be documented and an audio recording must be made, if practical. *Id.* at (h)(1)(A-B). If an audio recording is not practical, the reasons must be documented. *Id.* at (h)(2).

¶ 52      Defendant argues that detectives violated the statute when they allowed Weatherby to opt out entirely of any recording of his identification. Defendant contends that highlighting the violation of this statute on cross-examination of the detectives would have furthered trial counsel's strategy of attacking the police investigation in this case. Defendant maintains that counsel's failure to highlight the detectives' violation of this statute prejudiced him such that he is entitled to relief for ineffective assistance of counsel.

¶ 53      "The Lineup Statute" governs the manner and means by which law enforcement conducts lineups. 725 ILCS 5/107A-2, 107A-0.1 (West 2017) (the term lineup includes a photo array). A video record of all lineup procedures must be made unless it is not practical or the eyewitness refuses. *Id.* § 107A-2(h). If making a video record is not practical or the eyewitness refuses, an audio record shall be made, if practical. *Id.* §§ 107A-2(h)(1), 107A-2(1)(B). The Lineup Statute identifies the following as "consequences" of noncompliance: (1) the trial court can consider noncompliance as a factor in adjudicating a motion to suppress an eyewitness identification or any other motion to bar an eyewitness identification; and (2) when warranted by the evidence at trial, the trial court must instruct the jury that it may consider noncompliance to assist in its

weighing of the identification testimony of the eyewitness. *Id*. § 107A-2(j)(1)-(2); *In re N.A.*, 2018 IL App (1st) 181332, ¶ 33.

¶ 54    To be entitled to relief on a claim of ineffective assistance of counsel, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that he suffered prejudice as a result. *Strickland*, 466 U.S. at 694.

¶ 55    Weathersby admitted at trial that he identified defendant in the photo array in question. Weathersby admitted that he wrote on the photo array, "first name Michael, hang out night of shooting, shooting at car that drove past." Weathersby likewise identified defendant at trial. The detective who conducted the photo array with Weathersby was an independent administrator of the lineup—he knew nothing about the case or the persons involved. To prevail on a claim for ineffective assistance of counsel, a defendant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Enis*, 194 Ill. 2d 361, 376 (2000). It is undisputed that Weathersby identified defendant in the subject photo array. Neither defendant nor Weathersby alleged that his identification of defendant was the product of official misconduct in the presentation of the photo array.

¶ 56    Defendant states that, because trial counsel did not point out the detectives' violation of the statute, "counsel *failed to maximize* the defense attacks on Semaja Weathersby's pretrial identification statement." (Emphasis added). However, for a defendant to receive assistance of counsel that is constitutionally adequate, he need not receive representation that *maximizes* all his possible defenses. *People v. Rodriguez,* 364 Ill. App. 3d 304, 312 (2006) ("Effective assistance of counsel means competent, not perfect, representation."). Nothing about the failure to record the out-of-court identification undermines confidence in the outcome of the trial. No argument

was made that Weathersby's identification was coerced nor was an argument made that he did not, in fact, identify defendant in the photo array. Had defense counsel pointed out to the jury that the detective failed to follow a statute and record the out-of-court identification by either audio or video, there is not any probability that the outcome of the trial would have been different. We find that defendant is not entitled to relief for ineffective assistance of counsel based on counsel's failure to point out the detectives' failure to strictly follow the statute governing lineup procedures.

¶ 57                                    IV. Cumulative Error

¶ 58      In a single-paragraph argument, defendant argues that the cumulative effect of the errors he raised above deprived him of a fair trial (citing *People v. Johnson*, 215 Ill. App. 3d 713, 734-35 (2001)). However, we have found no individual error in the issues raised by defendant and, thus, there cannot be cumulative error. *People v. Doyle*, 328 Ill. App. 3d 1, 15 (2002).

¶ 59                                      V. Sentencing

¶ 60      Defendant argued that the trial judge erred during sentencing by failing to explicitly address certain factors that must be considered when a juvenile is sentenced in criminal court. However, in his reply brief, defendant concedes that his argument has recently been rejected in a controlling decision and he therefore concedes the issue for this appeal.

¶ 61                                       CONCLUSION

¶ 62      Based on the foregoing, we affirm.

¶ 63      Affirmed.