THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHEL D. PARKER, Defendant-Appellant.

(No. 56632;

First District (1st Division)—November 5, 1973.

James J. Doherty, Public Defender, of Chicago, (Elliott M. Samuels, Assistant Public Defender, of counsel,) for appellant.

Bernard Carey, State's Attorney, of Chicago, (Kenneth L. Gillis and Roger L. Horwitz, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE HALLETT delivered the opinion of the court:

The defendant was indicted for the murder of Alice Thomas, was found guilty by a jury which recommended the death penalty and was sentenced to a term of 100 to 200 years in the State Penitentiary. He contends (1) that he was denied a fair trial and due process of law by the reception of inflammatory and irrelevant evidence and by improper and prejudicial arguments of the prosecutor; (2) that Lee Burnett, the victim's son and the only eye witness, lacked sufficient intelligence and maturity to testify competently and the court erred in allowing him to testify; and (3) that the sentence of 100 to 200 years is excessive and should be reduced.

We conclude that none of these contentions is well founded and affirm the judgment.

Prior to trial, defense counsel moved to exclude the testimony of Lee Burnett, the 8-year-old paraplegic son of the victim, on the ground that he was incompetent to testify because he lacked intelligence and maturity. At the pretrial hearing, Lee testified accurately as to his age and birthday but not as to colors or time—he could not tell time and could not distinguish between brown and black. He testified that he had attended school but he could not recall for how long or where. He demonstrated an ability to count accurately. He remembered his grandmother's first name but not her last name. When asked as to whether he could distinguish between truth and a lie, he responded that if you do not tell the truth you get whipped and both the judge and God would be mad at you. He remembered that when he took the stand he swore to tell the truth and nothing but the truth. On redirect by the People with respect to whether he had been coached, he stated:

"I knew the answer to the question when you asked me if I knew Michel. I told you who he was. And when you asked me to tell you what Michel did that day, I told you. You didn't tell me what to say."

Lee's former school teacher testified that he was a slow learner, corroborated by a tested I.Q. of 79, and that he was a spastic child due to cerebral palsy. She stated that he was able to differentiate between people and that his reports about other children's activities to her had been accurate. On the basis of all this testimony, the court denied the defendant's motion.

At the trial, Lee Burnett testified that on the morning of March 14, 1970, he awoke and, while crawling and dragging himself toward the bathroom, saw the defendant, whom he had known for some time as a boyfriend of his regular baby-sitter, stabbing his mother, who was lying on the floor of the bathroom, with a butcher knife several times in the face. He further testified that he tried to grab the defendant's foot but the defendant kicked him in the stomach and ran out of the house.

Ms. Carrie Griffin, the deceased's next door neighbor in the apartment, testified that at about 7:00 A.M. she heard the deceased's doorbell ring and that she heard her admit the caller to the building. About 15 minutes later, she and another tenant, Ms. Elizabeth Cook, approached the deceased's apartment where they found blood on the stairs and walls outside it and Lee Burnett sitting near the rear door of his mother's apartment with bloodstains all over his underwear. Ms. Cook ran into Ms. Griffin's apartment and called the police.

The police testified that upon arriving they found Ms. Thomas' body partially clothed and lying in a pool of blood. Near her body they found two butcher knives. She had been stabbed more than 30 times in her upper torso and face. They also found blood all over the inside door-knob of the rear door of the apartment and a trail of blood outside the apartment leading to the porch of a nearby house. The Logans who lived there testified that the defendant, whom they had known for several years and who was a personal friend of James Logan, had come to their porch sometime between 7:00 A.M. and 8:00 A.M. that morning with badly bleeding hands wrapped in a coat dripping with blood. James Logan testified that he had previously seen the defendant on the street outside Ms. Thomas' apartment around 7:00 A.M. and that at that time his hands appeared to be uncut. The Logans testified that the defendant told them he had just been cut by some boys who had jumped him. A friend of the Logans took him to the hospital. On the basis of this information, police proceeded to the hospital where they placed him under

arrest. They returned him to the deceased's apartment where Lee Burnett identified him as the man he had seen stabbing his mother.

Evidence obtained by the police crime lab showed that there were two types of blood in the apartment: type B belonging to the victim was all over the apartment (principally the kitchen and bathroom) and on the defendant's clothing; type A which matched the defendant's blood was fund inside the apartment on the doorknob and on the ground outside the apartment leading to the Logan's porch.

The defendant took the stand and denied that he stabbed Alice Thomas. He testified that he had gone to a party the night before and that afterwards he went with a friend, Ricky Perkins, to Perkins' house located across the street from Ms. Thomas' apartment and that he and Ricky sat around talking and listening to records until early in the morning. He left at that time so that Ricky's mother would not awaken and find that he had been there that late. Perkins corroborated this testimony but indicated that he thought Parker had left around 6:15 or 6:20 A.M. Instead of going home to his aunt and uncle's with whom he was then having difficulties, Parker testified that he went over to Alice Thomas', whom he claimed he knew quite well and considered a good friend. He admitted that on the way over he saw James Logan. He rang the doorbell and Alice Thomas let him in. He testified that he asked Alice to allow him to grab some sleep in the back room and that she awaken him at 6:30 or 7:00 A.M. in time for him to go to work. He claimed that he fell asleep and was later awakened by her struggles with an unknown intruder. The intruder then attacked him inflicting the wounds on his hands and after a 15 minute struggle the intruder fled. Parker testified that he left the deceased's apartment in a panic, tripping over Lee Burnett in so doing, and fled over to the Logan's seeking help. When asked why he did not tell them what had allegedly happened instead of the story about being cut up by some boys who jumped him, he responded that he was afraid he would be charged with murder. He further claimed that Lee Burnett was mistaken about identifying him as the attacker.

## I.

Let us first consider the defendant's contention that Lee Burnett was incompetent due to lack of intelligence and maturity and that the court erred in finding him competent and in permitting him to testify at the trial.

The defendant correctly states the criteria for determining the competency of a child witness when he says:

"Every person over the age of 14 years is presumed competent. (*Shannon v. Swanson*, [1904, 208 Ill. 52, 54-55].) When a child under that age is called as a witness, it is the duty of the trial judge to conduct a preliminary inquiry to determine whether the child is competent to testify. (*People v. Crews*, 38 Ill.2d 331, 338.) As stated by the court in *People v. Sims*, 113 Ill.App.2d 58, 251 N.E.2d 795, 797: 'If (a child's) testimony is to be permitted, the court's inquiry must, with reason, satisfy the judge that the witness is sufficiently mature (1) to receive correct impressions by his senses, (2) to recollect these impressions, (3) to understand questions and narrate answers intelligently, and (4) to appreciate the moral duty to tell the truth (and comprehend the meaning of the oath). [Citations omitted.]' "

■■ Although the defendant has pointed out some minor inaccuracies in Lee Burnett's testimony, our inspection of the record has led us to conclude that his testimony was accurate in all material respects and that he demonstrated both an understanding of truth and an ability to recall, notwithstanding his particular handicaps. We find no merit in the contention that he was an incompetent witness.

## II.

We next consider the defendant's contention that he was denied a fair trial and due process of law by the reception of inflammatory evidence and by improper and prejudicial argument.

The first subdivision of this contention is the charge that the defendant was prejudiced by extensive evidence and argument relating to the victim's surviving children.

It is true that the State did make reference to the fact that the victim's children survived her, but they were necessarily involved in the facts of the case. The defendant was a visitor in their home where the crime occurred in the presence of one of her children who testified at the trial.

The applicable law on this issue is well capsulized in *People v. Vasquez* (1969), 118 Ill.App.2d 66, 254 N.E.2d 617, where, in affirming, this court, at page 74, said:

"Although it has been held that references to a victim's wife and family may prejudice a defendant in the eyes of a jury (People v. Bernette, 30 Ill.2d 359, 197 N.E.2d 436; People v. Gregory, 22 Ill.2d 601, 177 N.E.2d 120; People v. Dukes, 12 Ill.2d 334, 146 N.E.2d 14), the mere fact that there was such a reference does not, in every instance, require reversal. People v. Jordan, 38 Ill.2d 83, 230 N.E.2d 161; People v. Golson, 32 Ill.2d 398, 207 N.E.2d 68; People v. Brown, 30 Ill.2d 297, 196 N.E.2d 664; People

v. Thomas, 93 Ill.App.2d 77, 235 N.E.2d 298. Whether such references are sufficiently prejudicial to warrant reversal depends upon the facts of each case  *  *  *."

In addition to the cases cited in the above quotation, see *People v. Gonzales* (1968), 40 Ill.2d 233, 242, 239 N.E.2d 783; *People v. Lee* (1969), 44 Ill.2d 161, 171, 254 N.E.2d 469; and *People v. Hyde* (1971), 1 Ill.App.3d 831, 842, 275 N.E.2d 239.

■■ In the light of the circumstances of this case, we conclude that the evidence and closing arguments, insofar as they referred to the victim's surviving children, were not such as to require reversal.

The defendant next argues that he was prejudiced and denied a fair trial by the introduction and extensive use of gruesome photographs of the victim. The defendant cites *People v. Speck* (1968), 41 Ill.2d 177, 242 N.E.2d 208; *People v. Lefler* (1967), 38 Ill.2d 216, 221-222, 230 N.E.2d 827; *People v. Jackson* (1956), 9 Ill.2d 484, 490-491, 138 N.E.2d 528; and *People v. Burson* (1957), 11 Ill.2d 360, 373, 143 N.E.2d 239.

In *Speck*, our Supreme Court, in affirming the judgment, at pages 202-203, said:

"*  *  * The defendant's claim is that the photographs lacked any probative value and were so shocking in nature that they would inflame the passions of the jurors. It is the rule that where photographs are relevant to establish any fact in issue that they are admissible in spite of the fact that they may be of a gruesome nature. In *People v. Jenko*, 410 Ill. 478, the court said: 'Evidence having a natural tendency to establish the facts in controversy should be admitted. A party cannot have competent evidence excluded merely because it might arouse feelings of horror and indignation in the jury. Any testimony concerning the details of a murder or other violent crime may have such tendencies, but manifestly this could not suffice to render it incompetent. Of course, where spectacular exhibits having little probative value are offered for the principal purpose of arousing prejudicial emotions they should be promptly excluded. But questions relating to the character of the evidence offered, and the manner and extent of its presentation, are largely within the discretion of the judge, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant.' In that case the court held that there was no error in admitting into evidence photographs of a deceased girl's body showing the various wounds inflicted upon her. In *People v. Kolep*, 29 Ill.2d 116, the trial court admitted into evidence photographs of a deceased woman as she had been found and also photographs of her body at the

morgue. The trial court had ruled that the pictures were admissible to show the condition of the victim's clothing, certain bruises on her body, and to show the amount of force that had been used, and we held that the ruling of the trial court was not in error, in spite of the shocking nature of the pictures. In *People v. Myers*, 35 Ill.2d 311, the defendant argued that photographs of the deceased should not have been admitted into evidence because the police officer had described the body as they had found it and the photographs could serve only to anger and inflame the jury. We held that the admission of photographs of a decedent is discretionary with the trial judge and ruled that the judge had not abused that discretion.

In this case the photographs of the deceased girls showing the location of the bodies in the various rooms corroborated to some extent, the testimony of Miss Amurao. * * * The photographs also helped to establish the degree of force used by the killer * * *."

The latest expression of our Supreme Court is found in *People v. Henenberg* (1973), 55 Ill.2d 5, 302 N.E.2d 27, where the court, at page 13, stated:

"The second matter that may arise upon the new trial concerns photographs of the decomposed body and oral testimony as to its condition, as well as a graphic demonstration with a color slide and model skull. The defendant contends that there were 'cumulative and highly prejudicial and obviously intended to arouse the emotions of the jury against the defendant.' There are three photographs to which the defendant objects. One depicts the deceased's skull and left arm, which was in a plaster case, while the other two, one of which is in color, depict different views of his skull. We have held that 'where photographs are relevant to establish any fact in issue * * * they are admissible in spite of the fact that they may be of a gruesome nature.' (*People v. Speck* (1968), 41 Ill.2d 177; 202; see also *People v. Jenko* (1952), 410 Ill. 478, 482.) In this case the photograph of the skull and left arm showed the condition of the body as it was found and corroborated testimony concerning the cause of death and the identity of the victim. The other two photographs, which showed a bullet hole in the skull, tended to show the cause of death. It was not error to admit all three photographs into evidence. (*People v. Newbury* (1972), 53 Ill.2d 228, 242.) They did not become unnecessarily cumulative because there was oral testimony concerning the same issues."

See also *People v. Puckett* (1972), 6 Ill.App.3d 206, 211, 285 N.E.2d 258; *People v. Conrad* (1967), 81 Ill.App.2d 34, 41, 225 N.E.2d 713.

In the case now before us, the defendant contends that not he, but an intruder with whom he, unarmed, fought for 15 minutes, had inflicted the fatal wounds on the deceased. The pictures in question were pertinent and material to the likelihood of this contention in that they demonstrate that, although in said purported encounter with the intruder the defendant suffered only cuts on the palms of his hands (perhaps when his grip on the knives slipped), the deceased was cut in a similar encounter with her attacker some 32 times on almost every part of her body. They also corroborated the testimony of Lee Burnett that his mother was stabbed repeatedly in the face. They also are pertinent to the savage character of the attack on the victim. We conclude that they were pertinent and properly admitted, although gruesome.

It should be noted: (1) that all of the photographs of which the defendant now complains were introduced and admitted into evidence only after his counsel expressly stated that he had no objection to their admission; and (2) that the error now urged was not specifically urged in his motion for a new trial.

The most recent expression of our Supreme Court on this is contained in *People v. Killebrew* (1973), 55 Ill.2d 337, where the court, at page 341, stated:

"* * * It is clear that a ground for objection may be waived by a failure to make objection. We said in *People v. Thompson*, 48 Ill.2d 41, 45-46: 'Objections to evidence may be waived by failure to interpose proper objections in apt time, even though based upon constitutional grounds. (*People v. Trefonas*, 9 Ill.2d 92, 98; *People v. McCrimmon*, 37 Ill.2d 40, 47; *People v Hicks*, 35 Ill.2d 390, 395; see *Mapp v. Ohio, fn. 9*, 367 U.S. 643, 659, 6 L.Ed.2d 1081, 1092, 81 S.Ct. 1684, 1693.) The rationale underlying the procedural waiver doctrine is a sound one, based upon the need for timely resolution at trial of evidentiary questions. The salutary consequence of the waiver rule is that "A party cannot sit by and permit evidence to be introduced without objection and upon appeal urge an objection which might have been obviated if made at the trial." (*People v. Trefonas*, 9 Ill.2d 92, 98.)' "

Furthermore, although the record disclosed that, after the court had admitted all of the State's exhibits into evidence, the two knives were passed to the jury, it does not reflect the passing of any of the photographs amongst them at that juncture. During the closing argument, one of the pictures was displayed to the jury but which one we are unable to determine. It is clear from the record that, *by agreement*, only 10 of the

15 photographs now objected to were taken by the jury when they retired to consider their verdict.

Although we are of the opinion that some of the ten photographs that did go to the jury were unduly repetitious and would better have been omitted, we conclude that, in view of the foregoing and the strong State's case, their admission and submission to the jury does not constitute reversible error.

██ Another argument by the defendant under this general point of prejudice is the claim that the State, by putting in proof that all of the tests of the victim's body proved *negative* for semen and the prosecutor's mention of the fact, indicated that the State was, in reality, trying to insinuate into the minds of the jury that precisely the opposite should be considered by them. We see no merit in this contention.

Finally, the defendant contends that he was deprived of a fair trial by various remarks made by the State in the final argument to the effect that the defendant was an "animal"; that he is here claiming "rights, the same rights he denied to Alice Thomas. She didn't have a trial"; etc.

██ Describing the defendant as an "animal", while not to be encouraged, is not, under circumstances such as those in the case at bar, reversible error particularly where, as here, the proof as to the defendant's guilt of a vicious crime is overwhelming. See *People v. Weaver* (1972), 7 Ill.App.3d 1104, 1106, 288 N.E.2d 669; *People v. Poole* (1970), 121 Ill. App.2d 233, 257 N.E.2d 583; *People v. Welton* (1968), 96 Ill.App.2d 167, 173, 238 N.E.2d 141; and *People v. Johnson* (1966), 66 Ill.App.2d 465, 471, 214 N.E.2d 354.

With respect to the State's remarks concerning the defendant's denying to his victim rights which he himself seeks, our Supreme Court, in *People v. Ciucci* (1956), 8 Ill.2d 619, 627-628, 137 N.E.2d 40, held that a similar argument did not require a reversal where, as here, the State's case was overwhelming and the crime was "atrocious".

It should also be noted that no objection was made to these remarks. Under these circumstances, our Supreme Court's language in *People v. Smothers* (1973), 55 Ill.2d 172, 302 N.E.2d 324, is pertinent:

> "* * * We note, however, that no objection was made during argument, and we are unable to say that the improper remarks were so prejudicial that defendant did not receive a fair trial or were so flagrant as to threaten deterioration of the judicial process. (*People v. Moore*, 9 Ill.2d 224, 232.) The character and scope of argument to the jury is left very largely to the trial court, and every reasonable presumption must be indulged in that the trial judge has performed his duty and properly exercised the discretion vested in him. (*North Chicago Street Ry. Co. v. Cotton*, 140 Ill. 486.) The general atmosphere of the

trial is observed by the trial court, and cannot be reproduced in the record on appeal. The trial court is, therefore, in a better position than a reviewing court to determine the prejudicial effect, if any, of a remark made during argument, and unless clearly an abuse of discretion, its ruling should be upheld. (*City of Chicago v. Chicago Title & Trust Co.*, 331 Ill. 332.)  *  *  *."

With respect to the inflammatory character of the State's final argument in general, our Supreme Court, in *People v. Nicholls* (1969), 42 Ill.2d 91, 245 N.E.2d 771, has stated, at page 100:

> "*  *  *  We find that some of the prosecutor's remarks were improper but we do not find under the circumstances of this trial that because of them the judgment should be reversed. Considering the comments made in the light of the evidence of guilt presented by the prosecution it cannot be said they represented a material factor in the conviction and that the verdict would have been different had the comments been unsaid. *People v. Armstrong*, 41 Ill.2d 390; Agenda 30; *People v. Kirk*, 36 Ill.2d 292; *People v. Mackey*, 30 Ill.2d 190; *People v. Naujokas*, 25 Ill.2d 32; *People v. Berry*, 18 Ill.2d 453; and *People v. Stephens*, 6 Ill.2d 257."

See also *People v. Pittman* (1973), 55 Ill.2d 39, 302 N.E.2d 7.

We therefore conclude that defendant's contention that he was prejudiced and denied a fair trial is without merit.

### III.

This brings us to the defendant's third and final contention—that the sentence of 100 to 200 years was excessive and should be reduced.

■■ We do not agree that the sentence he received was excessive. We have examined the record and conclude that the trial judge's decision was carefully considered in view of the uncertain state of the law regarding capital punishment and the legitimate aims of criminal law—deterrence, isolation, rehabilitation, and the seriousness of the defendant's crime. Further, the sentence was within the limits fixed by the law which the defendant was convicted of violating. Ill. Rev. Stat. 1969, ch. 38, par. 9—1.

The rule is that the imposition of sentence is a matter of discretion for the trial judge and we will not interfere unless there has been a clear abuse of the discretion. *People v. Williams* (1970), 130 Ill.App.2d 192, 264 N.E.2d 589; *People v. Schmidt* (1957), 10 Ill.2d 221, 139 N.E.2d 726.

We therefore affirm the judgment of the trial court.

Judgment affirmed.

GOLDBERG and EGAN, JJ., concur.