THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DANNY LEE *et al.*, Defendants-Appellants.

First District (1st Division)   No. 78-722

Opinion filed July 21, 1980.

Ralph Ruebner and Daniel Cummings, both of State Appellate Defender's Office, of Chicago, for appellant Danny Lee.

James J. Doherty, Public Defender, of Chicago (Michael Mikula and Ronald P. Alwin, Assistant Public Defenders, of counsel), for appellants Augustus Lewis and Felton Chase.

Richard E. Gorman, of Chicago, for appellant Jerome Trosclair.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Robert J. Kaiser, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:
Defendants Augustus Lewis, Felton Chase, Danny Lee and Jerome Trosclair were indicted for murder, attempt murder, aggravated battery, armed robbery and burglary. Pretrial severance motions were denied, and defendants were tried jointly by a jury. The jury found defendants Lewis and Chase guilty of three counts of armed robbery and one count of burglary. The jury found defendants Lee and Trosclair guilty of one count of murder, one count of attempt murder, three counts of armed robbery, one count of burglary and one count each of aggravated battery and battery. The trial court sentenced Lewis to three concurrent terms of 15 to 25 years' imprisonment for the armed robberies; Chase to three concurrent terms of 20 to 30 years for the armed robberies; Lee to five concurrent terms: 60 to 120 years for murder, 30 to 60 years for attempt murder and three terms of 20 to 30 years for armed robbery; and Trosclair to five concurrent terms: 40 to 80 years for murder, 25

to 50 years for attempt murder, and three terms of 25 to 30 years for armed robbery. All defendants appeal.

The State's evidence indicated that on January 12, 1976, Michael Watson, Kimberly Rhymes, Dewana Beard and Rhymes' and Beard's children lived in a third-floor apartment at 2117 East 70th Street, in Chicago. That evening the following people were also present: Darryle Sanders, Reginald Bell, Sr., Reginald Bell, Jr., Mary Ann Watson, Lorenzo (Junior) Boyd, Carl, Stanley and Sandra Watson, and William Cox. At about 10:30 p.m., Michael Watson answered a knock on the apartment door. Present outside the door were defendants Chase, Lewis, Trosclair and Lee, and Trosclair's brother Kenneth. Trosclair and Chase told Watson they wanted someone named "Junior" outside or they were coming in. Watson did not admit the visitors and defendants left the building. Michael and Carl Watson left the apartment 20 minutes later and went to a liquor store.

At about 11:30 p.m., Stanley Watson answered another knock on the apartment door. Defendant Trosclair asked for Michael Watson, and Stanley said he was not there. Trosclair grabbed Stanley around the neck and put a gun to his head. Within seconds, all the defendants entered the apartment. Reginald Bell, Sr., Kimberly Rhymes and Lorenzo Boyd ran out the back door. Sandra Watson, William Cox and Reginald Bell, Jr., ran and hid in the pantry. Reginald Bell, Sr., returned to the apartment and led his son out the back door. William Cox also left through the back door. Bell, Sr., then returned to the apartment.

Trosclair dragged Stanley Watson into the kitchen, gathered the people remaining (except Sandra Watson, who remained hidden in the pantry), and ordered them into the living room. There, he made them lie on their backs on the floor. Darryle Sanders, who was intoxicated, was sleeping nearby.

While in the kitchen, Trosclair had given Lee his gun. In the living room, Lee proceeded to take money, wallets, jewelry and articles of clothing from Stanley Watson, Mary Ann Watson and Bell, Sr. Lee tried to awaken Darryle Sanders by kicking him twice, but was not successful.

Trosclair then said, "Kill them all." Dewana Beard pleaded for their lives. Trosclair said, "No, don't shoot Dewana, she is pregnant." Lee then said, "I have to shoot, I have to kill someone." He said he had to kill at least two people. While Lee and Trosclair talked, Chase and Lewis took the stereo set out the front door of the apartment.

Lee first shot Reginald Bell, Sr. He then shot Darryle Sanders. Trosclair was nearby and watched the shootings. Lee and Trosclair then fled from the apartment.

At this point, Michael and Carl Watson returned to the apartment building and found Reginald Bell, Jr., hiding behind a car. They entered the apartment and found Darryle Sanders sitting on the toilet with a bullet

hole in his stomach. Bell, Jr., went over to his father, who said, "Buddy, I love you."

Outside in the alley, Kimberly Rhymes·had flagged down a squad car driven by Officer Thomas Wortham. Rhymes got in the car and as they drove toward the apartment, she saw three male Negroes running towards the alley and said, "There they go; that's them." The alley was blocked by a four-door black Oldsmobile. Two men were in the car and three others were about to get in. All five men fled from the car and ran into a courtway. Wortham and his partner stopped their squad car in the alley and pursued the five men on foot.

Wortham heard footsteps going up the back porch stairs of the building. Wortham then saw Lewis walk out into the alleyway. Lewis explained that he had come from his apartment on the second floor. Wortham investigated that apartment, discovered that Lewis did not live there, and arrested Lewis. Lewis also gave a false name.

Other officers joined in the search and found defendants Trosclair, Lee and Chase and Kenneth Trosclair crouched behind a garbage can on a third floor landing. They were arrested and various stolen items were recovered from them and from the Oldsmobile. Wortham also recovered a revolver from the curb near the Oldsmobile. Lee's fingerprints were on the revolver.

Reginald Bell, Sr., was pronounced dead of gunshot wounds at the hospital. Darryle Sanders sustained serious abdominal injuries. The five men arrested were placed in a 15-man lineup. Kimberly Rhymes and Mary Ann Watson identified the four defendants. Sandra Watson identified Lee, Trosclair and Chase as the men she saw break in before she hid in the pantry. Stanley Watson identified Lee, Trosclair and Chase as the men he had an opportunity to see.

Lewis testified in his own behalf, and his testimony was adopted by Chase. On January 12, 1976, after 7:30 p.m., Lewis, Trosclair (his half-brother), Chase (his cousin) and Kenneth Trosclair went to 70th and Merrill to pick up Chase's suitcase from his brother Reginald's apartment. Near Reginald's apartment they saw a parked car belonging to a man named Larry. They had got into an argument with Larry earlier that day. They entered a building and knocked on the third floor apartment door. Michael Watson answered the door; a conversation ensued and became heated. The three defendants and Kenneth Trosclair left at the suggestion of Reginald Lewis, who came out of a nearby apartment. They then picked up Lee and someone named Larry and subsequently returned to the vicinity of 70th and Merrill to pick up Chase's suitcase. Larry, Trosclair and Lee got out of the car. Kenneth Trosclair parked the car in an alley behind Reginald's apartment building and Lewis, Chase

and Kenneth went to Reginald's apartment. No one answered the door.

As they descended the stairs, they heard two gunshots. Lewis saw Larry running down the street carrying a stereo and defendant Trosclair running close behind. Everyone but Lee got into the car. However, at the sight of flashing blue lights, everyone jumped out of the car and ran. Lewis ran toward his brother's apartment and then returned to his car. There he was arrested by the police and questioned. Lewis testified that he told the officer his correct name and address.

Lee testified in his own behalf and sought to establish a compulsion defense. He testified that he was an epileptic and had been having seizures ever since he had been hit in the head with a pipe and had gotten a bullet in his head. Lee explained that in 1972 defendant Trosclair came over to Lee's house with a gun. When Lee picked up the gun it went off and a bullet lodged in his head. The bullet remained in his head and its entryway is covered by a metal plate. Lee described his epileptic fits as "fallout"—an inability to recall what had happened.

At this point, the trial court instructed the jury to ignore all of Lee's testimony regarding the shooting, being hit by the pipe and his epilepsy, because it was irrelevant and not supported by medical testimony.

Lee further testified that when he was in school he belonged to the Disciples Gang and that Trosclair was the leader. Leaders told the other members what to do. Other questions pertaining to gang activity were objected to and sustained. The jury was instructed to disregard occurrences and relationships Lee had prior to 1974. The court stated that the only admissible evidence of compulsion would be "that that occurred just prior to the time of occurrence, within a reasonable period of time, * * *." Lee made an offer of proof as to earlier events.

Lee then testified that on the evening of January 12, 1976, he planned to go out with a woman, but left with Trosclair because Trosclair told him to and he feared Trosclair. Lee, Chase, Lewis, Trosclair and Kenneth Trosclair got in a car and drove to Reginald Chase's home. They parked in front of Reggie's house and met someone named Larry. Lee, Larry and Trosclair went to a third floor apartment Lee had never visited before. Trosclair knocked on the door, talked for a few minutes and then busted the door in. Trosclair put his gun to the head of the man at the door and told the people inside the apartment to lie on the floor.

Lee further testified that he kept asking Trosclair to leave. Trosclair turned around, called to Lee and shoved the pistol into Lee's stomach. Trosclair told Lee to kill everyone. Lee said no, but Trosclair kept hollering, "Kill everyone." Lee said that he could not shoot the pregnant woman and Trosclair replied, "Don't shoot her then. Shoot them two." Lee had the gun and was near the door and Trosclair was behind him. He

said he fired the gun because Trosclair was behind him and he didn't know if Trosclair had another gun. He was afraid of being killed by Trosclair or someone in the house. Lee shot twice, ran and was apprehended by the police. He denied taking any property.

On appeal, defendants assert that the trial court erred: (1) in denying their respective severance motions, renewed severance motions and motions for mistrial; (2) by excluding Lee's testimony concerning his long-standing relationship with Trosclair, thereby depriving him of his right to present a defense of compulsion; (3) in refusing Lee's proffered instructions on compulsion; (4) in belittling Lee and his counsel in front of the jury; (5) in allowing decedent's young son to offer cumulative testimony that would prejudice and inflame the jury; (6) by allowing an officer to testify to a statement Lewis made when the substance of that statement was not provided during pretrial discovery; and (7) in imposing excessive sentences upon Lewis and Chase.

Defendants contend that they should have had severed trials. Trosclair and Lee were the only defendants to make pretrial severance motions. Lee's written motion alleged that his interests and defenses were antagonistic with codefendants for reasons apparent from Lewis' answer to the State's discovery motion. Lewis' answer, filed on February 28, 1977, indicated that he believed the evidence would show that the crimes charged were committed solely by Lee and Trosclair. Lewis further stated that he may assert the defense of alibi and would rely on the State's inability to prove him guilty beyond a reasonable doubt. Lee further alleged that he had reason to believe that Trosclair's and Chase's defenses would be similar to Lewis' defense. Lee's motion was not supported by affidavit.

All the defendants responded to the State's discovery motions, revealing the following anticipated defenses: Trosclair, Chase and Lee all indicated they would rely on the inability of the State to prove them guilty beyond a reasonable doubt. Chase also stated that he may use an alibi defense. Lee also indicated that he may assert the defense of alibi, insanity, necessity, duress or self-defense. Lee's answer was filed on June 10, 1976; Chase's on September 13, 1977; and Trosclair's on September 29, 1977.

On June 28, 1977, Lee's severance motion was heard and denied by the trial court. At this time, Trosclair had not filed a severance motion and did not join in Lee's motion; indeed, his attorney was not even present for argument on this motion.

Lee's counsel argued essentially the same points contained in his written motion. Additionally, Lewis' counsel, a public defender, made a statement to clarify Lewis' discovery answer. He originally represented Trosclair, Chase and Lewis. However, his investigation revealed evidence

that Lee and Trosclair were the perpetrators of the crimes charged. Because of this conflict of interest he was granted leave to withdraw as Trosclair's and Chase's attorney. The trial court denied Lee's motion for severance, finding that antagonistic defenses had not been proved.

On September 29, 1977, Trosclair filed a motion for severance, alleging co-defendants' defenses were antagonistic. He stated that he believed co-defendants made statements and admissions, not attributable to him, which the State would use at trial and that at least one of the co-defendants will or has given the State statements implicating him. These allegations were not supported by affidavit. On December 9, 1976, the State filed an amended answer to discovery indicating that Lee made an oral statement. The answer further indicated that the time, place, date and contents of the statement were set out in police reports tendered to the defense in open court. The record does not contain these reports nor does it indicate that the trial court was apprised of either the reports or Lee's statement during the hearing on Trosclair's severance motion.

Trosclair did not argue this motion until immediately before the jury was sworn on September 29, 1977. The trial court found that the mere possibility that a co-defendant would testify against Trosclair was not a sufficient basis to grant a separate trial.

Generally, defendants jointly indicted should be jointly tried unless fairness to one or more defendants requires a separate trial. (*People v. Jones* (1976), 40 Ill. App. 3d 850, 353 N.E.2d 375; Ill. Rev. Stat. 1975, ch. 38, par. 114—8.) Whether a separate trial should be granted lies in the sound discretion of the trial court and its determination will not be reversed unless there is an abuse of discretion. (*People v. Henderson* (1976), 39 Ill. App. 3d 164, 351 N.E.2d 225.) Of paramount concern is whether their defenses are so antagonistic that a severance is imperative to a fair trial. *People v. Yonder* (1969), 44 Ill. 2d 376, 256 N.E.2d 321, *cert. denied sub nom. Guido v. Illinois* (1970), 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094.

A motion for separate trials of jointly indicted defendants must be made before trial. (*People v. Precup* (1977), 50 Ill. App. 3d 23, 365 N.E.2d 1007, *aff'd* (1978), 73 Ill. 2d 7, 382 N.E.2d 227.) Insofar as the motion is based on facts not appearing of record, it should be supported by affidavit. (*People v. Miner* (1977), 46 Ill. App. 3d 273, 360 N.E.2d 1141.) Defendant must demonstrate how he would be prejudiced by the denial of a separate trial (*People v. Rhodes* (1969), 41 Ill. 2d 494, 244 N.E.2d 145) and must disclose specific grounds why the severance should be granted. (*People v. Brinn* (1965), 32 Ill. 2d 232, 204 N.E.2d 724, *cert. denied sub nom. Clements v. Illinois* (1965), 382 U.S. 827, 15 L. Ed. 2d 72, 86 S. Ct. 62.) Mere apprehension of a conflicting situation does not provide the trial court with sufficient grounds for granting a severance motion. (*People v.*

*Nickson* (1978), 58 Ill. App. 3d 470, 374 N.E.2d 804.) Moreover, the fact that separate counsel had been appointed for jointly indicted defendants because of a conflict of interest does not, standing alone, entitle defendants to separate trials. *People v. Friedrich* (1960), 20 Ill. 2d 240, 169 N.E.2d 752; *People v. Arnold* (1968), 91 Ill. App. 2d 282, 233 N.E.2d 764.

The reviewing court will consider only petitions filed by defendants and matters alleged therein, and not subsequent happenings at trial. (*People v. Yonder* (1969), 44 Ill. 2d 376, 256 N.E.2d 321, *cert. denied sub nom. Guido v. Illinois* (1970), 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094.) Nonetheless, the trial court has a continuing duty at all stages of trial to grant a severance if prejudice appears. *People v. Clark* (1979), 71 Ill. App. 3d 381, 389 N.E.2d 911; *cf. Schaffer v. United States* (1960), 362 U.S. 511, 4 L. Ed. 2d 921, 80 S. Ct. 945 (application of Federal Rules of Criminal Procedure).

■■ Applying these principles, we find that Lee's pretrial severance motion was properly denied. Lee asserted that Lewis' defense would be antagonistic. Lewis' discovery answer indicated that he may assert an alibi defense and believed the evidence would implicate Lee and Trosclair. However, Lee's discovery answer indicated that he might use any of the following defenses: alibi, insanity, necessity, duress or self-defense. Only an alibi defense would necessarily be antagonistic. The other affirmative defenses serve to concede the actions yet deny criminal culpability.

Lee relied upon no ground for severance other than antagonistic defenses, did not support his motion by affidavit and presented the mere apprehension of a conflict. (*People v. Nickson.*) Under these circumstances, the appointment of separate counsel because of a conflict did not entitle Lee to a separate trial. *People v. Arnold.*

Nor do we believe that Lee was prejudiced at trial. His compulsion defense was not antagonistic with defenses presented by any co-defendant.

■■ We also find that Trosclair's pretrial severance motion was properly denied. Trosclair asserted that co-defendants made statements that would be used to implicate him at trial. These allegations were not supported by affidavit nor are the alleged statements part of the record. Trosclair's mere apprehensions that co-defendants might implicate him are insufficient to sustain his pretrial severance motion.

■■ We next turn to the issue of whether the trial court erred by failing to · grant a severance for Trosclair at trial. Trosclair's answer to the State's discovery motion indicated he would rely on the inability of the State to prove him guilty beyond a reasonable doubt and that he might testify. During opening statements, his attorney represented that Trosclair would testify and establish his innocence. His counsel also made a continuing

motion for severance throughout the trial and made timely motions for a mistrial based on co-defendants' testimony.

Lewis' testimony indicated that Trosclair was let out of the car at the scene of the crimes and that Trosclair fled following "Larry," who was carrying a stereo. Moreover, Lee's compulsion defense directly implicated Trosclair in the crimes charged.

Co-defendants' testimony was patently antagonistic to Trosclair's defense. This was not apparent until trial. They placed Trosclair at the crime scene, indicated his responsibility for the crimes charged and inferred that he was fleeing with stolen property. Co-defendants' testimony may have necessitated Trosclair's decision not to testify.

The cumulative effect of co-defendants' antagonistic defenses prejudiced Trosclair.[1] We cannot conclude beyond a reasonable doubt that the jury was uninfluenced (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824), and find that as to Trosclair the trial court breached its continuing duty to grant a severance when prejudice becomes apparent.

■ Lewis and Chase contend that they should have been granted a mistrial and severance because Lee's mentioning of gang membership prejudiced all defendants. Lee, however, only testified that he and Trosclair were gang members. Therefore, Lewis' and Chase's allegations of prejudice are conjectural. In any event, after deliberation, the trial court instructed the jury to disregard all events and relationships Lee had between 1970 and 1974, including gang membership. Moreover, the single reference to Lee and Trosclair's gang membership, without testimony that the gang was involved in the instant crimes or other criminal activities, does not constitute prejudicial error. See *People v. James* (1972), 4 Ill. App. 3d 1042, 1051, 282 N.E.2d 760.

We next consider Lee's claims concerning the defense of compulsion. Section 7—11(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 7—11(a)) provides:

> "A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct."

Initially, we note that there is serious doubt whether the defense of compulsion is applicable in a murder prosecution. (*People v. Smith* (1974), 19 Ill. App. 3d 36, 311 N.E.2d 164; see Ill. Ann. Stat., ch. 38,

---

[1] We note also that Lee's testimony that Trosclair was the leader of the Disciples street gang, although subsequently stricken from the record, augments the prejudicial impact of co-defendants' antagonistic defenses.

par. 7—11, Committee Comments, at 432 (Smith-Hurd 1973).) In any event, we find the trial court's rulings were proper.

Compulsion is an affirmative defense and, once it is properly raised by some evidence, the State must overcome it by proof beyond a reasonable doubt. (*People v. Colone* (1978), 56 Ill. App. 3d 1018, 372 N.E.2d 871.) Once compulsion is raised and "some evidence" is presented which supports the defense, it is error to refuse to instruct the jury on the defense. *People v. Adcock* (1975), 29 Ill. App. 3d 917, 331 N.E.2d 573. ■■ So long as the fear of great bodily harm is reasonable, the defense of compulsion is available even though defendant might be mistaken in his belief of imminent danger. (*People v. Adcock.*) However, the defense is available only where compulsion has arisen without the negligence or fault of defendant. (*People v. Rodriquez* (1975), 30 Ill. App. 3d 118, 332 N.E.2d 194.) If defendant has ample opportunities to withdraw from the criminal enterprise but fails to do so, he may not avail himself of the compulsion defense. *People v. Colone.*

Lee contends that his testimony concerning his past relationship with Trosclair supported his defense of compulsion, was improperly ruled inadmissible and that his motion for a mistrial was improperly denied. He also asserts that the trial court erred by not giving instructions he proffered on compulsion.

When the trial court curtailed Lee's references to activities which occurred six or seven years before the incident, his counsel made an offer of proof.

In addition to Lee's testimony which was stricken from the record (concerning his injury from a gun supplied by Trosclair and gang activity), counsel sought to introduce evidence of situations Lee was involved in as a youngster: Lee would testify that when Trosclair and he were gang members Trosclair gave him certain orders. Lee believed Trosclair would harm him if he disobeyed. Lee was told not to go to a certain park. When he disobeyed, he was beaten with a baseball bat. Counsel represented there were other incidents that made Lee reasonably believe on January 12, 1976, that Trosclair would seriously harm him for disobeying an order. Counsel did not specify what these incidents were.

The rest of Lee's testimony was allowed at trial because it pertained to how Lee and Trosclair interacted on January 12, 1976. Lee explained that he broke a date that night because Trosclair told him to come with him. Lee did not mention any threats of death or great bodily harm should he not accompany Trosclair. When defendants arrived outside the victims' apartment, Lee went with Trosclair and Larry, even though he did not know where they were going. Again, Lee did not mention that Trosclair threatened or forced him to go along.

At the apartment door, Trosclair talked to a man and then suddenly broke the door down, put a gun to the man's head and went inside the apartment. Lee claimed that he stood at the door watching. He did not attempt to leave the building. Nor did he testify that he was compelled to remain or that Trosclair held the gun on him.

Lee watched Trosclair order the occupants of the apartment to lie on the floor. He kept saying to Trosclair, "Come on, let's go." Lee, however, did not leave. Lee further testified that Trosclair shoved the pistol at him and ordered him to kill everyone. Trosclair subsequently changed his command to kill only two, because Lee would not shoot the pregnant lady.

Lee stated that he was near the door and Trosclair was behind him. Lee claimed that he shot two people because he feared Trosclair, because Trosclair might have had another gun and because he feared the inhabitants of the apartment.

■■ We believe that Lee's testimony fails to establish "some evidence" of compulsion. Lee was not in jeopardy of an imminent infliction of death or great bodily harm, since he had the gun and never saw Trosclair with another weapon the night of the incident. Trosclair ordered Lee to shoot two people, but neither threatened to harm Lee if he failed to obey nor had the apparent ability to harm Lee. Moreover, Lee testified that Trosclair had run before he fired the second shot. Lee also had ample opportunity to withdraw from the criminal enterprise at its early stages, yet chose to remain.

Because Lee's account of the incident fails to support the affirmative defense of compulsion, the trial court's exclusion of his testimony concerning his relationship with Trosclair from 1970 to 1974 was not error. Lee's offer of proof is too remote and speculative. Furthermore, it is irrelevant as to Lee's state of mind at the time of the shooting because any fear of Trosclair was unreasonable under the circumstances of this case. Finally, having failed to raise "some evidence" of compulsion, defendant is precluded from obtaining jury instructions on this defense. *People v. Adcock* (1975), 29 Ill. App. 3d 917, 331 N.E.2d 573.

■■ Lee next contends that he was prejudiced when the trial court belittled him and his counsel in the presence of the jury. Specifically, Lee complains of four remarks. The first remark occurred when Lee tried to explain how he shot himself in the head in 1972:

> "A. Like, you know, Jerome had a gun, you know, he was at my house. So they was playing with it at first, you know. I went to the door and they said it wasn't no bullets in the gun.
>
> [Assistant State's Attorney]: Objection. Objection.
>
> The Court: Basis?

Mr. Goggin: It's hearsay.

The Court: He is stating what happened. He can testify.

[Assistant State's Attorney]: Judge, if I may. He just said, 'They said.'

The Court: When you say 'they say,' are you saying that—

The Witness: The People say.

The Court: They told you. Mr. Lee, you are advised not to indicate anything that anybody told you. You can only tell the court what happened to you that you know from your own knowledge only. You understand?

The Witness: Uh-huh.

The Court: Do not indicate what anybody else told you. You understand? You follow me on that matter, do you not? You know what I'm saying?

The Witness: You saying—

The Court: You could tell the court what happened to you that you know from your own personal knowledge. Not what somebody else told you. You understand?

The Witness: But I was saying, you know—

The Court: Well, I'm just telling you.

The Witness: This is how I got shot. I was trying to explain. I didn't want to say no names.

The Court: I understand. But I just wanted to let you know that you are limited only to tell what happened to you that you know yourself. Okay. You know that for your own personal knowledge. Continue."

Lee contends that the court's remarks create the impression that he was a deliberately noncooperative witness. We find that the court was merely explaining the hearsay rule to Lee until it felt Lee exhibited an understanding of the rule. A witness is not discredited merely by the court's admonitions to respond properly to questions. *People v. Mahaffey* (1978), 60 Ill. App. 3d 496, 504, 377 N.E.2d 85.

We have reviewed the record as to the second and third remarks by the trial court and find no error. The second remark was merely a reminder of the court's prior warning concerning hearsay testimony. In its third remark, the court explained that it was necessary for Lee to avoid narrative answers. The court's admonitions served to make Lee aware that his testimony must comply with evidentiary restrictions in order to avoid further objectionable testimony.

Finally, Lee asserts that his counsel was disparaged by the court's comments. Lee testified that he shot the victims because of things he had seen "[a]s long as I have known him." Lee's attorney then asked:

"Q. Known who?

A. Jerome.

Q. What have you seen?

[Assistant State's Attorney]: Objection.

The Court: Counsel, would you—Reporter, would you repeat that last answer?

(Answer read.)

The Court: Mr. [Defense Counsel], to go beyond what we have discussed with reference to this matter, you are in dangerous territory. You may continue. Objection overruled.

[Defense Counsel]: Judge, I have to have a side bar. I don't want to violate any rules.

The Court: Mr. [Defense Counsel], I don't think a side bar is necessary.

[Defense Counsel]: Have any of the things that you have seen happen [*sic*] subsequent to 1974? Have any of the things that you are referring to happen [*sic*] subsequent to 1974. After 1974?

[Assistant State's Attorney]: Objection.

The Court: Objection sustained. Counsel, you're making a vague remark. Unless you have a situation, time, date and place and who was present in these the court will not let you go into that.

[Defense Counsel]: I don't know what he is referring to, Judge. I have to ask him when this happened.

The Court: Counsel, you are aware of the rules of evidence. Are you aware of the rules of evidence?

[Defense Counsel]: I am aware of them.

The Court: Thank you.

[Defense Counsel]: I would like a side bar, Judge."

During the side bar, Lee's counsel moved for a mistrial on the ground that he, and thus his client, was belittled in front of the jury. The trial court denied the motion, but said to the jury:

"The Court: While he is forming his question ladies and gentlemen of the jury, I had made a remark with reference to Mr. [Defense Counsel], whether or not he knew the rules of evidence.

I would like to say that I apologize before you. Certainly that question was not called on on [*sic*] my behalf and I should never have addressed that. If he didn't know it he wouldn't be here.

So I wish you would disregard that statement with reference to it, and thank you.

Go ahead, Mr. [Defense Counsel].

[Defense Counsel]: Thank you."

We note that the court had previously acknowledged problems with

Lee's testimony, but said to Lee's attorney: "But you understand the rules" and "You understand the rules of evidence and narrative answers." Thus, Lee's counsel had been warned that the trial court expected him to abide by the rules of evidence in phrasing questions. Indeed, immediately before questioning counsel the court stated, "Counsel, you are aware of the rules of evidence."

■■ The court's inquiry appears to be in the nature of a firm reminder that counsel apply the rules of evidence he knew in phrasing questions, rather than impugning counsel's knowledge of the rules of evidence. Moreover, the court's apology to counsel in the presence of the jury and its instruction that the jury disregard the statement alleviated any mis-apprehension by the jury as to the purpose and meaning of the court's remarks. Review of the record convinces us that this remark was merely one isolated incident contrasted against a consistent pattern of cordiality and helpfulness to counsel exhibited by the trial court. In any event, the court's remarks evidently were provoked by defense counsel's failure to properly question his witness. (*People v. Mahaffey*.) Accordingly, Lee suffered no prejudice. See *People v. Beasley* (1977), 54 Ill. App. 3d 109, 369 N.E.2d 260.

Lee next contends that the trial court erred in admitting the testimony of Reginald Bell, Jr., the murder victim's son, and that the State inflamed the jury in closing remarks about his testimony. Lee further contends that Bell's testimony was cumulative and unnecessary because the State had already presented a "life-and-death witness."

Sannon Bell, widow of the deceased Reginald Bell, Sr., testified as the State's life-and-death witness. Reginald Bell, Jr., testified, not as a life-and-death witness, but as an occurrence witness. He did not witness the shooting, but properly testified as to the events leading to the incident and to the discovery of the victim, his father. Reginald was near his father's car when he heard two shots. He saw two people run down the stairs, cross the street and run into the alley. One of them carried a record player. No one else testified about this occurrence. Upon returning to the apartment, Reginald went to his father. The colloquy at trial was simply:

"Q. [by State]: What happened when you went over to your father?

A. He said, 'Buddy, I love you.'

Q. He was alive at that time?

A. Yes."

The rest of Reginald's testimony concerned transporting his father to the hospital.

During closing, the State argued:

"Reginald Bell testified he saw the people running out of the apartment. You heard him testify to that. He was ducked down

behind a car to hide because he might have got shot, too, because he was a witness. He was a witness to this armed robbery-home invasion-murder. He corroborated his testimony with Kim and what Sandy and what Mary Ann testified to.

He went back into that apartment and he will have to live with it for the rest of his life. And he was kneeling over his daddy and his dad said, 'Buddy, I love you.' His dad died by this bullet. His dad died by the hands of those four people seated in this courtroom.

Why did he have to die? What was the sense of it?"

The extent to which cumulative evidence may be received rests within the discretion of the trial court. (*People v. Nahas* (1973), 9 Ill. App. 3d 570, 292 N.E.2d 466.) The court may exclude cumulative evidence, especially when it is encumbered by other irrelevant evidence. (*People v. Raby* (1968), 40 Ill. 2d 392, 240 N.E.2d 595, *cert. denied* (1969), 393 U.S. 1083, 21 L. Ed. 2d 776, 89 S. Ct. 867.) Evidence that the deceased left a spouse and family generally is not admissible because it is not relevant to the guilt or innocence of defendant and might inflame the jury. (*People v. Dukes* (1957), 12 Ill. 2d 334, 146 N.E.2d 14.) Closing argument which dwells upon decedent's family is also inflammatory and improper. (*People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436.) However, reference to or evidence that a murder victim had a family does not warrant a reversal where the victim's children are necessarily involved in the facts of the case (*People v. Parker* (1973), 15 Ill. App. 3d 774, 305 N.E.2d 228, *cert. denied* (1974), 419 U.S. 865, 42 L. Ed. 2d 102, 95 S. Ct. 120), or witness the incident. See *People v. Jayne* (1977), 52 Ill. App. 3d 990, 368 N.E.2d 422.

We note that not all of Reginald's testimony was cumulative. Rather, he established an important portion of the State's case: two fleeing felons carrying stolen property from the crime scene. Thus, Reginald's testimony was necessarily part of a proper presentation of the State's case. (*People v. Jayne.*) The State's questioning of Reginald pertaining to his father was more incidental to his earlier testimony than calculated to prejudice the jury because of sympathy for the deceased's family. It was not presented in such a manner as to cause the jury to believe it was material. (See *People v. Wilson* (1972), 51 Ill. 2d 302, 281 N.E.2d 626.) The State's closing comments merely reiterated Reginald's testimony and did not dwell upon decedent's family, and did not prejudice Lee.

Defendants Lewis and Chase argue that the trial court erred in allowing Officer Wortham to testify that Lewis gave him a false address at the time of his arrest. They contend that their motions to strike the testimony or for a mistrial should have been granted. Lewis told Wortham he was coming from his apartment on the second floor. Defendants contend that they did not receive the substance of this oral statement as

required under Supreme Court Rule 412 (Ill. Rev. Stat. 1977, ch. 110A, par. 412). Instead, the State's answer to discovery stated that defendants "made no statements except to state their name, age and address." The State's amended answer to discovery indicated that police reports, tendered to the defense in open court, contained pertinent information on statements made by the defendants. Lewis' arrest report shows that the arrest was made at 2141 East 70th Street and that his residence was at 738 East 103d Place.

Wortham testified that he saw the assailants flee from the car in the alley and then heard footsteps on the rear porches. He then saw Lewis walk out into the alleyway. Wortham stopped Lewis and asked him where he had come from. Wortham testified, "He told me he was coming from his apartment on the second floor." Wortham investigated and determined that Lewis did not live there.

We agree that the State's discovery answer is misleading. Rule 412 requires that the State disclose "* * * the substance of any oral statements made by the accused or by a codefendant, * * *." A better State answer would be that when arrested Lewis claimed to live in a second floor apartment at 2141 East 70th Street. The State would not be obligated to expose the falsity of Lewis' claim because that was only apparent from subsequent investigation and not from his statement alone. However, defense counsel apparently would have learned of this discrepancy from the police reports which listed Lewis' current address, or from questioning his client.

■■ Defense counsel claimed surprise that Lewis gave a false address and alibi upon arrest. However, he made no motion for a continuance, but proceeded to cross-examine Wortham. Where defendant does not request a continuance but proceeds with trial, he has waived the issue of disclosure upon review. (*People v. Callaham* (1978), 60 Ill. App. 3d 1020, 377 N.E.2d 171.) In any event, Lewis' statement did not bear upon a material issue in this cause and disclosure would not have altered the outcome of the trial.

Finally, Lewis and Chase claim their sentences are excessive because they were held responsible for the actions of Trosclair and Lee. Chase was sentenced to three concurrent terms of 20 to 30 years and Lewis to three concurrent terms of 15 to 25 years for these armed robberies. Defendants assert that these sentences amounted to murder sentences and that the trial court believed them guilty of murder despite murder acquittals by the jury.

■■ These sentences were clearly within the statutory range and absent an abuse of discretion may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Examination of the record convinces us that the trial court properly relied upon the

presentence investigation reports and matters presented in aggravation and mitigation. Defendants' assertion that the court imposed sentences believing them guilty of murder is unfounded. We cannot say that the trial court abused its discretion in sentencing.

For all the aforementioned reasons, the conviction and sentences of defendants Lee, Lewis and Chase are affirmed; the conviction of defendant Trosclair is reversed, and his cause is remanded to the circuit court of Cook County for a new trial.

Affirmed in part, and reversed and remanded in part.

GOLDBERG, P. J., and McGLOON, J., concur.